UNITED STATES of America

v.

Luther Langford TAYLOR, Larry Blanding and Benjamin J. Gordon, Jr., also known as B.J. Gordon.

UNITED STATES of America

v.

Paul Wayne DERRICK.

UNITED STATES of America

v.

Jefferson Marion LONG, Jr.

Criminal Nos. 3:90–00339, 3:90–00434, 3:91–00091 and 3:91–00384.

United States District Court,
D. South Carolina,
Columbia Division.

Feb. 28, 1997.

David P. Butler, Robert J. Meyer, Richard C. Pilger, U.S. Department of Justice, Public Integrity Section—Criminal Division, Washington, DC, for U.S.

Joel W. Collins, Jr., Collins & Lacy, Columbia, SC, for the Defendant Taylor.

James Edward Bell, III, Bell, Bagley & Davis, Sumter, SC, for the Defendant Blanding.

Lionel S. Lofton, Charleston, SC, for the Defendant Gordon.

James H. Lengel, Nashville, TN, for the Defendant Derrick.

Jack Swerling, Columbia, SC, Thomas C. Brittain, Myrtle Beach, SC, for the Defendant Long.

## ORDER

HAWKINS, District Judge.

This matter is before the court on motions to dismiss the superseding indictment against defendants LUTHER LANGFORD TAYLOR, LARRY BLANDING and BENJAMIN J. GORDON, JR., and the indictments against defendants PAUL WAYNE DERRICK and JEFFERSON MARION LONG, JR., on the grounds of prosecutorial, agency and/or investigative misconduct. Each defendant in these cases has joined in the motions of the other defendants. All of these defendants are back before this court for retrials on remand from the Fourth Circuit Court of Appeals.

The court has reviewed each of the motions, the memorandums in support of and in opposition thereto, the transcripts of the various hearings, and the numerous exhibits attached to the memorandums and filed with the court in support of oral arguments.[1] The court is convinced that the totality of the government's actions in these matters rises to the level of egregious prosecutorial misconduct, and that this is a sufficient finding on which the court can exercise its supervisory power.

A tedious analysis of the case law has not provided any clear standards or guidelines for the dismissal of indictments when the government has been found guilty of misconduct. It does appear to be clearly established that the dismissal of an indictment is a drastic step; however, the court believes it has the discretion under the doctrine of the court's supervisory power to dismiss should it find the government's actions so outrageous as to offend the sensibilities of the court.

The government would argue that in using its supervisory power the court must find pattern and prejudice, and that the defendants have proven neither. The court agrees that the circuits are in disarray on this subject, but believes there is sufficient precedent to dismiss the subject indictments without addressing these issues. A fuller discussion

---

1. The court has also sought to develop some of the issues by reviewing other documents on record in the evidence room.

of its authority under the supervisory power doctrine will be found at the conclusion of this order.

I have wrestled with some sanction short of dismissal, but find that the only remedy available to these defendants that would be commensurate with the misconduct of the government is in the dismissal of these indictments. I am of the opinion that the nature and breadth of its misconduct is indicative of the drastic steps the prosecution took to win these cases, and that the resultant injustice to these defendants cannot be fully remedied by new trials. Therefore, the court must take the equally drastic step of invoking its supervisory power to dismiss these indictments with prejudice.

## I. PROCEDURAL HISTORY

These cases arise from an FBI investigation of drugs and corruption in the South Carolina State House, code-named "OPERATION LOST TRUST," that eventually involved some twenty-eight State legislators, lobbyists and others. In early 1988, Special Agent Michael S. Clemens of the Federal Bureau of Investigation's Columbia, South Carolina, office, commenced an investigation of drug violations by members of the South Carolina State Legislature. On April 28, 1989, a registered South Carolina lobbyist, Ronald L. Cobb, was apprehended by the FBI after attempting to invest in a drug deal with an undercover agent. When approached by Clemens and other FBI agents, Cobb, realizing he had been caught in the commission of a felony, told the agents he could help them with a far more serious problem—political corruption in the State House. The FBI was in possession of some historical evidence of political corruption in the State House at that time, but had never developed sufficient evidence to indict any legislators or lobbyists. Cobb was given the opportunity to avoid prosecution for the drug deal in exchange for becoming a paid confidential informant.

Over the next several months, the details of a sting operation were developed with Cobb's assistance. It was ultimately determined to utilize a pari-mutuel betting bill then before the legislature; to set Cobb up as the lobbyist for a bogus corporation known as The Alpha Group, and to have Cobb let it be known that he had funds available for those legislators who would assist him in the passage of this legislation. The resulting corruption charges of Conspiracy to Commit Extortion under Color of Official Right and Extortion under Color of Official Right against these and some of the other defendants were brought pursuant to the Hobbs Act, Title 18, United States Code Section 1951. Other defendants were indicted on drug charges pursuant to various sections of Title 21, United States Code.

On August 24, 1990, the first of the criminal indictments, No. 3:90–339, was returned against defendant LUTHER LANGFORD TAYLOR, a member of the S.C. House of Representatives, charging him with one count of conspiracy to commit extortion and five substantive counts of extortion, and ROBERT ALFRED KOHN, also a member of the S.C. House, charging him in the conspiracy count. Kohn pled guilty on September 26, 1990.

On September 19, 1990, Taylor[2] filed a motion to dismiss the indictment on the grounds of prosecutorial, agency and/or investigative misconduct, which was heard and taken under advisement on September 24, 1990. A supporting memorandum was filed on October 1, 1990; the government filed its opposition on October 4th, and the motion was denied by this court on October 9, 1990. On October 15, 1990, the trial of Taylor commenced, and on October 25th he was found guilty on all six counts of the indictment. Taylor's post-trial motions were denied, and he was sentenced to seventy-eight months on each of the six counts, the said sentences to run concurrently. Taylor appealed his conviction. Bond pending appeal, vigorously opposed by the government, was denied.

2. In the interest of brevity and continuity, the designations of the defendants by their surnames are used to denote the defendants personally and, where appropriate, to denote the defendants by and through their attorneys.

During this time, on September 21, 1990, a six-count indictment, No. 3:90–434, was returned against Ennis Maurice Fant, Larry Blanding and Benjamin J. Gordon, also members of the State House of Representatives. These defendants, likewise, filed a joint motion to dismiss for prosecutorial misconduct on November 7, 1990, to which the government responded on November 15, 1990. The motion was denied at a hearing on November 19, 1990. Fant pled guilty to the conspiracy count of the indictment on February 22, 1991, and trial proceeded as to Blanding and Gordon on February 25, 1991. On the first day of trial Gordon filed another motion to dismiss for prosecutorial misconduct, which was denied. Guilty verdicts as to both defendants were returned on March 7, 1991. After two hearings, their motions for acquittal and new trial were denied on August 7, 1991. Blanding was sentenced the following month to thirty-seven months each on the conspiracy count and two substantive counts of extortion, said sentences to run concurrently, and remained on bond until he commenced serving his sentence upon designation by the Bureau of Prisons. Defendant Gordon's sentencing on one count of conspiracy and one substantive count of extortion was postponed as the result of contested legal issues relating to sentencing and, subsequently, the defendant's health. Both defendants appealed their convictions.

Defendant Paul Wayne Derrick was indicted on February 20, 1991, by a two-count criminal indictment charging conspiracy to commit extortion and extortion under color of official right, # 3:91–0091, and went to trial on May 1, 1991. On May 11th he was found guilty on both counts and was sentenced to thirty-four months on each count, said sentences to run concurrently. Derrick appealed this conviction and has remained free on bond.

Defendant Jefferson Marion Long, Jr. was a member of the South Carolina Senate who was indicted in a two-count Indictment, # 3:91–0394, charging conspiracy to commit extortion and extortion under color of official

right, on August 20, 1991. Trial commenced on November 12th; his motion for a directed verdict was granted as to Count 1 on November 22nd, and the jury returned a guilty verdict as to Count 2 on November 23, 1991. On March 26, 1992, this court granted this defendant's motion for a new trial, which order was appealed by the government. Long has since remained free on bond.

The Fourth Circuit Court of Appeals found that the jury charge given in the Taylor, Blanding and Gordon, and Derrick cases, to be in conflict with the subsequent holdings in *McCormick v. United States,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991) (on the issue of quid pro quo), and *Evans v. United States,* 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992) (on the issue of inducement), and remanded these three cases for re-trial. *See, USA v. Taylor,* 966 F.2d 830 (4th Cir.1992), *aff'd on reh'g,* 993 F.2d 382 (1993), and *cert. denied,* 510 U.S. 891, 114 S.Ct. 249, 126 L.Ed.2d 202 (1993); *USA v. Blanding,* No. 91–5871; 1992 WL 138353 (4th Cir. June 22, 1992); and *USA v. Derrick,* No. 92–5084; 1994 WL 34691 (4th Cir. Feb. 7, 1994). In another unpublished opinion, the Fourth Circuit Court of Appeals affirmed this court's decision granting a new trial in *USA v. Long,* No. 92–6799; 1994 WL 56993 (4th Cir. Feb. 25, 1994). Following remand, both Taylor and Blanding were released on bond. This court then granted Gordon a new trial on August 6, 1993.[3]

On July 1, 1993, this court issued an order for a statewide jury to be selected on August 16, 1993, in the retrial of Taylor. By order of August 2, 1993, trial was continued to November 8, 1993. On August 18, 1993, the government filed a Superseding Indictment which consolidated the Taylor case with the Gordon and Blanding case.

Taylor filed on September 29, 1993, the motion now still pending before this court to dismiss the superseding indictment on grounds of double jeopardy, claiming prosecutorial and/or agency misconduct, which mo-

---

**3.** Three other defendants indicted as a result of the Operation Lost Trust investigation went to trial on Hobbs Act charges. The convictions of two of these defendants were upheld by the Appeals Court; the third was found not guilty. All other Lost Trust defendants pleaded to either corruption or drug charges.

tion the government opposed on October 6, 1993. On October 19, 1993, the trial of the three defendants was continued to December 6, 1993, principally due to Gordon's health. Again on October 26, 1993, the trial was continued to the first available term following January 1, 1994. On November 29, 1993, however, the defendants received volumes of discovery material not previously furnished them by the government.[4] As a result, Taylor filed several supplemental *Brady* motions, and on February 20, 1994, he filed a supplemental memorandum in further support of his dismissal motion. Gordon filed his motion to dismiss on February 22, 1994.[5]

At this point, the United States Attorney for the District of South Carolina[6] sought an order of continuance and requested an investigation by the Department of Justice's Office of Professional Responsibility (DOJ/OPR).[7] On October 19, 1994, the U.S. Attorney for South Carolina recused his office from any further involvement in the cases, and attorneys from the Public Integrity Section of the Department of Justice were assigned as substitute counsel for the government.

■ On October 20, 1994, a status conference was held on the within cases. Each defendant joined in the motions of the others,

and discovery was consolidated with regard to the motions only. The court established an "Evidence Room" wherein the government[8] was ordered to place all discovery materials and make them available to these defendants.[9]

The defendants continued to file motions for additional discovery, and a hearing on Taylor's and Gordon's discovery motions filed March 15 and 17, 1995, was held in Columbia on April 19, 1995. This hearing resulted in the court issuing an order filed April 20, 1995, which stated in part:

> To avoid any further confusion as to what material should and should not be turned over by the government to the above defendants, it is
>
> ORDERED, that all documents and/or materials in possession of the government dealing with these cases and not presently available to the defendants in the "evidence room" be produced by the government directly to the court at Charleston, South Carolina, not later than Monday, May 8, 1995, for *in camera* inspection by the court. . . .

[Order, 4/20/95, pp. 2–3].

Following an extensive inspection of the documents submitted to the court, the court

---

**4.** The record subsequently shows that the government made a decision to "start over on discovery by providing it again." [DOJ/OPR Report, 10/18/4, p. 10].

**5.** Derrick also filed a separate motion to dismiss on grounds of prosecutorial misconduct and entrapment on April 19, 1995, which he supplemented on September 5, 1995. The government filed its opposition on September 27, 1995. In the summer of 1996, Derrick requested consideration of this motion without oral argument *on the issue of entrapment only*, and dismissal on this ground was denied by this court's order of August 7, 1996.

**6.** Upon Daniel's resignation as United States Attorney, John S. Simmons was appointed in early 1992 to that post. Upon Simmons' resignation effective in April of 1993, Margaret B. Seymour was appointed Interim U.S. Attorney, followed by the interim appointment of J. Preston Strom in May 1993. Strom's "permanent" appointment became effective July 30, 1993.

**7.** The reports of the DOJ/OPR and FBI/OPR dated October 18, 1994, December 6, 1994, and

February 16, 1995 [Hearing 4/19/95, Defendants Exhibits 30, 45 and 44 respectively] will be discussed later in this order.

**8.** The disclosure of discovery to defendants is primarily the responsibility of the USAO. Unless so distinguished, however, subsequent references herein to "the government" include all of the government agencies involved in the investigation and prosecution of these cases. In the eyes of the court there is no difference. Those indicted for crimes have a right to look to only one body—the government—for due process and a fair trial. One agency cannot point its finger at another, declaring "it's their fault—it's not our fault." It is the United States, represented by the United States Attorney, that is seeking redress; and, if a defendant does not receive a fair trial because of the failure of any one agency, that failure must be imputed to the government as a whole.

**9.** From this period on, the court conducted numerous *in camera* inspections of discovery materials at the request of the government. All documents ordered to be turned over to the defendants were done so under protective orders.

issued its order on July 25, 1995; and, following later submissions by the government, discovery orders were filed September 7 and October 6, 1995.

On October 18 through 20, 1995, the court held another hearing in Columbia. At this hearing, additional government files came to light and the defendants argued with specificity for reconsideration of portions of the court's order of July 25, 1995. They further requested FBI computer-generated printouts of the inventories of the FBI's entire "Lost Trust" and "Capital Gains" [10] investigatory files, which resulted in Taylor filing an additional motion on January 19, 1996. Following a second lengthy *in camera* inspection by the court, and in response to Taylor's January 1996 motion, the court issued an order on February 6, 1996. At that time, the court ordered that the hearing held in recess since the previous October be reconvened on March 11, 1996, at which time all parties were to "be prepared to present and complete testimony and arguments with regard to the motions to dismiss now pending before this court." The government subsequently moved on February 14, 1996, for reconsideration of the February 6th order, to which the defendant Taylor filed an objection, and the court ruled on this motion by order of February 23, 1996.

The health of defendant Gordon continued to be an issue, and his counsel sought a continuance of the March 11, 1996, hearing date. The continuance was granted; however, on May 24, 1996, the court, following a telephone conference with all parties, conditionally severed the defendant Gordon [11] and reset oral arguments on the dismissal motions for May 29, 1996. On the day prior to that scheduled hearing, May 28th, the undersigned judicial officer suffered a heart attack and underwent angioplastic surgery on that date, and again on June 28th and August 19th. Thus, the hearing was not reconvened until October 3, 1996. Following a full day's hearing on October 3rd, the parties were

given the opportunity to submit in writing any additional argument on matters in evidence on or before October 18th. The court received a letter under date of October 8, 1996, from the attorney for Taylor, and the government filed a memorandum on October 18, 1996, to which were attached Affidavits from former U.S. Attorney E. Bart Daniel, former Assistant U.S. Attorney Dale L. DuTremble, and Assistant U.S. Attorney John M. Barton, the chief prosecutors in these cases. [12] By letter under date of October 24, 1996, to the court, Derrick's attorney lodged a protest to the filing of the three Affidavits as an attempt by the government to add to the record after the close of the hearing, and the court ruled that the Affidavits would not be considered.

The joint motions of the above defendants to dismiss the superseding indictment as to Taylor, Blanding and Gordon and the indictments as to Derrick and Long on the grounds of double jeopardy and prosecutorial, agency and/or investigative misconduct are now ready for a ruling by this court.

## II. DEFENDANTS' MOTIONS TO DISMISS

Some three to four weeks prior to the commencement of his trial, Taylor filed his first motion to dismiss on the grounds of investigative agency and prosecutorial misconduct in which he charged (1) that the government's presentation to the Grand Jury was legally insufficient and exculpatory evidence was withheld, (2) that the conduct of the U.S. Attorney with regard to pretrial publicity had been improper, and (3) that the government engaged in fundamentally unfair investigative practices. Following a hearing and additional memorandums, this court denied his motion. [Order, 10/9/90].

Likewise, a joint motion was filed prior to trial by defendants Fant, Blanding and Gordon to dismiss for prosecutorial misconduct

---

10. The Capital Gains Tax issue is fully addressed hereinafter in this order.

11. Under the terms of this conditional severance, defendant Gordon was rejoined in this matter by order of January 21, 1997.

12. Hereinafter, the designation USA is used to denote United States Attorney; the designation AUSA is used to denote Assistant United States Attorney, and the designation USAO is used to denote United States Attorney's Office.

or, in the alternative, for sanctions, on the grounds (1) that the government violated an order of the court concerning pre-trial publicity, and (2) that the government violated the Code of Federal Regulations governing the release of information in criminal actions by personnel of the Department of Justice. The motion was denied at a hearing on November 19, 1990.[13] On the day jury selection commenced in the Blanding/Gordon case,[14] February 25, 1991, the defendant Gordon filed a motion to dismiss for prosecutorial misconduct on the ground that *Brady* material furnished by the government only three days earlier [15] would show that the government's key witness had perjured himself both at the Taylor trial and before the Grand Jury and that the government had taken no steps to correct the matter. The motion was denied by this court at a hearing on March 1, 1991.

The cases proceeded to trial, conviction, and remand on appeal. Prior to retrial, however, on September 29, 1993, Taylor filed a motion to dismiss on the grounds (1) that the government had withheld evidence both exculpatory in nature and favorable to Taylor in violation of the letter and spirit of the *Brady* case, and (2) that during the original trial proceedings the government generated extensive, prejudicial pre-trial publicity, thus denying defendant a fair trial in violation of the double jeopardy clause of the Fifth Amendment to the United States Constitution. At a hearing on October 12, 1993, the court took the motion under advisement. On February 12, 1994, Taylor filed a supplemental memorandum which informed the court that he had received from the government under date of November 29, 1993, a substantial number of documents and tapes never seen before. In the memorandum, Taylor identifies recently received materials which he claims overwhelmingly establish the extent and scope of the government's violations of its responsibilities under *Brady* at the time of his first trial. He cites to specific pre-trial discovery sought via five *Brady* motions. Additionally, he claims that the theories of his defense were disclosed prior to trial so that the government cannot claim that it failed to see the exculpatory nature of the evidence sought but not disclosed; that defendant made an ample, if not overwhelming, record of his *Brady* requests; that rather than disclose the evidence it had which could be used to impeach its witnesses, the government sought to preclude the issue, and that during the trial defendant made further requests for *Brady* material to which the government attorneys made deceitful responses, thereby breaching their duty as officers of the court.

On February 22, 1994, defendant Gordon filed his motion to dismiss the superseding indictment on the grounds (1) that the government intentionally withheld certain *Brady* material during his first trial, (2) that the government lied to the court about the existence of the *Brady* material, and (3) that the government allowed perjured testimony to be presented to the court.

Derrick filed his motion claiming prosecutorial misconduct in the withholding of *Brady* materials on April 19, 1995, and supplemented this motion on September 5, 1995.

Taylor filed a Second Supplemental Memorandum to his motion to dismiss on August 25, 1995, in which he expands his argument that the government was guilty of outrageous misconduct in that, among other things, it failed to supervise adequately a paid government informer, disregarded FBI regulations by questioning a target without *Miranda* warnings, delayed in transcribing interviews of witnesses, allowed false declarations before the Grand Jury and false testimony at trial which it did not correct, communicated with the defendant after trial without prior notice to his counsel, participated in prejudicial pretrial publicity, engaged in a pattern of conduct calculated to infringe on the Grand Jury's ability to exercise independent judg-

**13.** This motion was denied by The Honorable Charles E. Simons, Jr., U.S.D.J., who was originally assigned to hear this case. The case was subsequently reassigned to the undersigned.

**14.** Co-defendant Fant had pled three days before.

**15.** This disclosure followed a hearing on defendant Gordon's *Brady* motions of November 5, 1990, and January 7, 1991, wherein the court directed the government to furnish the specified material.

ment; misrepresented facts proven false by documents later found in the government's file, failed to present exculpatory evidence to the Grand Jury, withheld prior exculpatory testimony and misrepresented to the court and the defense that the prior testimony existed; tainted the proceedings by misrepresentations and indiscretions of government agents, failed to provide proper warning to a Grand Jury target prior to his testifying before the Grand Jury, and perjury by a government agent.

A Third Supplemental Memorandum was filed by Taylor on March 28, 1996, following access to discovery materials furnished by direction of this court's order of February 6, 1996, as amended by order filed February 23, 1996. Taylor argues here that the new materials prove (1) that throughout this sting operation the government violated its own representations, the instructions it was required to follow, and the rules designed to insure fairness; (2) the perjury of Ron Cobb and Agent Clemens, as well as the false statements and arguments of the government attorneys, and (3) willful *Brady* violations. He further contends that this material contains new *Brady* material of which defendants had no prior knowledge.

The defendants previously have taken issue with the handling of the investigation by the Department of Justice Office of Professional Responsibility (DOJ/OPR) and the Federal Bureau of Investigation Office of Professional Responsibility (FBI/OPR) after the OPR reports were furnished to the defendants in January of 1995. Taylor's letter submission of October 8, 1996, includes a summary of his allegations that the pattern of misconduct extends beyond the local FBI and U.S. Attorney's offices to a pattern of dissembling by FBI Headquarters and the Department of Justice as well.

## III. GOVERNMENT'S RESPONSES TO MOTIONS TO DISMISS

The government responded on October 6, 1993, to Taylor's motion to dismiss of September 29, 1993. These documents were filed following remand but prior to recusal by the U.S. Attorney for the District of South Carolina and prior to the government furnishing additional discovery materials to the defendant on November 29, 1993. The government's response was prepared by AUSA Barton, who states therein:

> The United States not only vehemently denies these allegations but also maintains that even if true, neither these allegations nor the Fifth Amendment provide any basis for dismissal of the Superseding Indictment in this case.

[Gov's. Response to Def. Taylor's Motion to Dismiss Indictment, 10/6/93, p. 1].

In its argument against the allegation of the suppression of exculpatory evidence being material to the outcome of the trial, the government states that the defendant Taylor failed to show that there was a reasonable probability that the result of the trial would have been different had the evidence been disclosed; and, further, that defendant did not make full use of the information available to him, and thus no *Brady* violation occurred. The government also argues that Taylor has "abjectly failed to support his 'extensive, prejudicial publicity' assertion." As to defendant's Fifth Amendment double jeopardy claim, the government relies on the finding in *United States v. Borokinni,* 748 F.2d 236 (4th Cir.1984), and concludes that, even if Taylor's alleged *Brady* violations were accurately stated and that the information was willfully withheld by the government, the Fifth Amendment's double jeopardy would not provide a basis for the dismissal of the indictment.

Following the receipt by defendant of additional discovery on November 29, 1993, as mentioned above, Taylor filed a supplemental memorandum on February 10, 1994, and Gordon filed his motion to dismiss on February 22, 1994; the matter was referred to the DOJ/OPR for investigation and attorneys from the Public Integrity Section, Criminal Division, of the DOJ were substituted for the U.S. Attorney's Office in South Carolina. In opposition to both Taylor's and Gordon's motions and memorandums, an extensive memorandum was filed on the government's behalf on October 31, 1994, by Daniel J. Butler, Senior Trial Attorney, and other DOJ attorneys.

The Butler memorandum reiterates the government's previous argument that there has been no showing of intentional government misconduct or longstanding pattern of misconduct. The government argues that the defendants' contentions primarily relate to the non-production of two FBI FD–302s,[16] and cites to the Fourth Circuit's ruling in *USA v. Taylor*, 966 F.2d at 837, where the court, in response to the defendant's claim that the government did not produce all evidence bearing on witness Cobb's credibility, held that "... [Taylor] is now aware of this evidence and may use it as the Rules of Evidence may provide at his retrial." The government claims that other *Brady* violation claims by the defendants, such as Cobb's use of cocaine, witness Robert Kohn's [17] use and sale of cocaine, other video- and audiotapes of Kohn and other taped interviews of co-conspirators, can also be remedied by a new trial. In response to other defense allegations, the government denies that there was any intentional misleading of the court or the defendant and no knowing presentation of perjured testimony. The government also makes its argument as to the requirement that the defendants must show prejudice, which it claims they have not done, and presents an argument against defendants' exclusive reliance on the case of *United States v. Shafer*, 987 F.2d 1054 (4th Cir.1993), for dismissal of the superseding indictment on double jeopardy grounds and against defendants' argument for dismissal based on the court's supervisory powers.

Subsequent to the above filings and as a result of a hearing on October 20, 1994, the "evidence room" was established as of December 1, 1994, in which the government was directed to make all discovery available to the defendants. Numerous discovery disputes arose; the court conducted *in camera* inspections of documents which the government sought to have excluded, and another discovery hearing was held on April 19, 1995.

Defendant Derrick then filed on that date his *separate motion to dismiss*. On August 25, 1995, Taylor filed his Second Supplemental Memorandum in which he detailed various other allegations of government misconduct he claims came to light only as a result of the additional discovery at his disposal. Derrick also filed a supplement to his motion on September 5, 1995.

On September 25, 1995, the government responded to Taylor's August (Second Supplemental) memorandum. It summarizes Taylor's arguments for dismissal as (1) nondisclosure of *Brady* material, (2) misstatements to the court regarding the existence of discovery material, and (3) the knowing presentation of false testimony. It incorporates its earlier response that "under either an 'outrageous' conduct theory or the Court's supervisory power, a motion to dismiss requires the defendant to prove *both* intentional governmental misconduct *and* demonstrable prejudice." [Footnote omitted]. Again, the government summarizes the defendants' contentions into three subject areas: (1) Taylor's response to the government's memorandum in opposition to the motions to dismiss; (2) the discovery produced since December 1, 1994, and (3) the capital gains tax matter. The government argues specifically with regard to defendant Taylor that, although he now has many more items of discovery which he did not have at his first trial, this is due in large part to the fact that he now has all of the Lost Trust discovery, whether it relates specifically to him or not. The government again argues that "the remedy for a significant *Brady* violation is a new trial, not dis-

**16.** An FBI FD–302 (sometimes referred to herein simply as a 302) is a government form used by the FBI. Its Manual of Administrative Operations and Procedures, Part II, Section 10–12(3), requires that "[o]riginal notes of interview with prospective witnesses and/or suspects and subjects must be retained in the 1A section of the case file. That is, in any interview where preparation of an FD–302 is required (an interview where it is anticipated the results will become the subject of court testimony) the rough handwritten notes are to be retained."

The defendants argue that these FD–302s allowed the primary government witness Cobb to testify falsely. They also dispute the government's conclusion that these two FD–302s form the only basis for their *Brady* violation allegations.

**17.** Robert Alfred Kohn, who was indicted with Taylor and who pled guilty as previously cited. Kohn also became a government informant later in the investigation.

missal of an indictment." As to Taylor's allegations of misstatements by the government to the court or the knowing use of false testimony, the government contends that defendant has completely failed to show bad faith on the part of the government and has not even "begun to refute the conclusions of the Offices of Professional Responsibility ... for the Department of Justice ... and the FBI which failed to find merit in [his] allegations." The government also puts forth the argument here that defendant Taylor lacks standing to challenge the alleged misconduct in trials of other Lost Trust defendants and there is no longstanding pattern of government misconduct. In this memorandum the government also refutes Taylor's allegations as to various items of evidence he claims were withheld. These items will be dealt with with specificity later in this order.

In its response to defendant Derrick's motion, the government also contends that this defendant has failed to show any intentional misconduct or a longstanding pattern of misconduct or any prejudice which would warrant dismissal of the indictment against him, and that any remedy to which he is entitled has been granted in his impending retrial.

After Taylor filed his Second Supplemental Memorandum in August 1995, this court, in October 1995, held a three-day hearing, which resulted in a second extensive *in camera* inspection and orders filed February 6 and February 23, 1996. The oral arguments by defendants in October 1995 were sufficient to convince the court that the volumes of material that continued to surface and their possible significance to the defendants warranted the issuance of an order directing the government to grant access to the defendants to many documents previously denied to the defendants by the court. Upon review of these documents, Taylor filed his Third Supplemental Memorandum on March 28, 1996, to which the government responded on April 16, 1996.

In its opposition, the government refers to its previous opposition briefs to show that Taylor

has failed to carry his burden of proving any intentional government misconduct, let alone a longstanding pattern of misconduct. ... Nor has the defendant demonstrated any prejudice to his rights that would affect the outcome of his retrial before this Court. Defendant's Memorandum merely cobbles together a voluminous stew of quotations from the government's administrative files together with unwarranted speculation and erroneous legal conclusions, all to support his theory that this Court should take the drastic and disfavored step of dismissing an indictment.

[United States' Opposition to Def. Taylor's Third Supp. Memo, 4/16/96, p. 1].

The government further responded to Taylor's argument—that the new materials prove that throughout this sting operation the government violated its own representations, the instructions it was required to follow, and the rules designed to insure fairness—by affirmatively stating that the government did not violate its internal policies and by citing to a disclaimer in the privately-published "DOJ Manual" to which the defendant's memorandum referred. It defends its use of the pari-mutuel betting bill for its "sting" operation and its payments to its primary witness, Ronald L. Cobb.

As to defendant's charge of perjury by Cobb and SA Clemens, as well as false statements and arguments by government attorneys, the government argues that no document in the government's files, no document quoted by the defendants, and none of the recently disclosed materials prove that Cobb testified falsely, but only that the government agents and prosecutors did not agree with certain of his interpretations.

In addition, as to the third general charge by defendants of willful *Brady* violations, the government again denies that any documents were willfully withheld or that the defendants are in any way prejudiced since the remedy of retrial is available.[18]

---

18. The government's memorandum expands on several of these arguments, but, as mentioned earlier in this order, the specifics of the allegations will be addressed later in this order.

In its Post–Hearing Memorandum in Opposition to Defendants' Motions to Dismiss, filed October 18, 1996, the government, in addition to its legal arguments as to the defendants' burden of proof, sets out the general denial that there was no intentional effort by the government to withhold discovery; that the discovery errors were, at most, inadvertent and immaterial, and that the government did not intentionally mislead the court about discoverable materials. This memorandum also addresses the defendants' claims of government-sanctioned perjury by Cobb and misconduct in the investigation of the capital gains tax matter. It also touches on several other defense allegations as will be more fully shown hereafter.

## IV. THE OPEN FILE POLICY

From the outset, these cases were to be tried under what is referred to in this district as an "open file policy." During its tenure on the bench, this court has conducted numerous criminal trials under this policy and never before has its interpretation been so challenged as in the government's present arguments. As a lawyer and a judge, this court's experience has been that "open file" meant that the government's entire discovery file would be made available to the defendants for their examination. There are, of course, certain documents excluded from this policy under the government's internal administrative and work product privilege. It has long been established that when an "open file" policy is declared, the dictates of *Brady* and *Giglio* as well as Bills of Particular, become extraneous; *all* discovery material, except as limited to privileged work product, is made available to the defendants. This would have come as no surprise to USA Daniel or his assistants, most of whom had prosecuted cases before this court on numerous occasions.

As shown above, motions to dismiss for prosecutorial misconduct had been filed by one or another of these defendants during the preparation and pendency of their original trials in 1990 and 1991.[19] One of the primary grounds on which those motions and the more recent motions are based is the willful withholding of *Brady* and other exculpatory material. The defendants have persisted in their allegations that the government had to be withholding evidence critical to their defense and specifically requested some of this evidence in their discovery motions. Where it felt appropriate, the court instructed the government to turn over requested materials, if they existed, to the defendant. But the government would respond by either declaring that disclosure or unredacting of the requested documents would jeopardize ongoing investigations or by affirmatively asserting, without any qualification, that it had complied with its discovery obligations. The existence of several specific documents sought by the defendants was denied in open court by the prosecutors and by SA Clemens under oath.

## V. DISCUSSION OF THE ISSUES

The instant cases first came before the court over six years ago with the indictment of Taylor in August 1990. The evidence as it relates to the retrials of these defendants is in and of itself voluminous. Together with the additional materials that relate to the charges of prosecutorial misconduct, the record now before the court is so vast as to make it virtually impossible to cite to all of the allegations and counter-arguments in detail.

The strongest arguments the defendants make as to the significance of the withholding of *Brady* materials and other exculpatory evidence are found in the arguments relating to several of the issues to be addressed by the court at this time. In addition, defendants' allegations of perjury by certain witnesses and the government's knowledge thereof, as well as alleged misrepresentations to the defendants, the Grand Jury and the court, rising to the level of fraud upon the court, as revealed by the post-remand disclosure of evidence, must also be addressed.

1. *The Withholding of Evidence as to Cobb's Characterization of the Payments Made to Legislators.*

Cobb consistently testified that he considered the monies he gave four of these defen-

---

19. The motions filed in connection with the initial trials have been incorporated by the defen-

dants with the motions to dismiss filed post-remand in these matters.

dants to be bribes.[20] These defendants have consistently argued that the monies they received were considered by them to be campaign contributions and contend that certain withheld 302s would have served to impeach Cobb's "bribery" testimony. On June 14, 1989, an FD–302 of a Cobb debriefing was prepared by SA Clemens. This 302, which was not turned over to the defendants until November 29, 1993, states on page 2:

> COBB related that in regards to giving money to State Legislators, he routinely gives two or three hundred dollars to some just to keep them friendly toward him.... COBB stated that TEE FERGUSON, CHARLES A. HARVIN, III and DONNA MOSS were among those who he would give money. COBB indicated this money was not paid for any specific return benefit other than having someone friendly to him on whom he could call.

[Taylor's Supp.Memo, 2/10/94, Exh. 4, p. 2].

Again, on June 22, 1989, Clemens prepared another Cobb FD–302, which did not surface until the Derrick trial. This 302 states in pertinent part:

> RONALD L. COBB provided a 1989 South Carolina Legislative Manual in which he had checked off all those legislators to whom he had paid money. When asked if these were bribe type payments or campaign contributions COBB replied, "That's a hard question to answer." *COBB was then asked if those checked off were persons he had given two, three, or four hundred dollars to for no specific reason other than to maintain favorable*

*contact with COBB. COBB indicated that this was the case, and indicated he would give the money to the legislator and that was it.* If the individual then wanted to claim it as a campaign contribution and report it or just stick it in his pocket, that was of no concern to COBB. [Emphasis added].

[Taylor's Supp.Memo 2/10/94, Exh. 1]

The names of each of the within defendants are shown as "checked off" in the Legislative Manual; however, the listing of names with check marks next to them includes the names of numerous other legislators who were never targeted or indicted by the government in the Lost Trust investigation.[21]

On July 26, 1989, another Cobb FD–302 was prepared by Clemens and was only turned over to the defendants after the issuance of this court's November 8, 1994, order. The following information is contained therein:

> COBB was asked about the manner in which he would pay legislators several hundred dollars. COBB stated that this was sometimes accomplished with cash, and sometimes by check, either from his business or personal account. COBB advised that sometimes payments were made at official fund raisers and sometimes in a social setting as a token of appreciation for support on something.
>
> COBB stated that sometimes a legislator will drop a hint that money is tight and that they could use some cash. COBB

---

**20.** Cobb testified at the Long trial that he knew Long was not accepting a bribe under the circumstances in which the money was exchanged.

**21.** A complete listing of the legislators checked off by Cobb includes State Senators James E. Bryan, Herbert U. Fielding, Donald H. Holland, John C. Land, Hugh K. Leatherman, W. Richard Lee, John C. Lindsay, Jefferson Marion Long, Isadore E. Lourie, J. Yancey McGill, Peden B. McLeod, Theo W. Mitchell, Thomas L. Moore, Michael F. Mullinax, Kay Patterson, Harvey S. Peeler, Jr., Edward E. Saleeby, Nikki G. Setzler, Horace C. Smith, J. Verne Smith, David L. Thomas, James M. Waddell, Marshall B. Williams, Addison Graves "Joe" Wilson, and State Representatives Milton O. Alexander, George H. Bailey, Boyd Odell "Dell" Baker, Liston D. Barfield, J. Michael Baxley, David M.

Beasley, Larry Blanding, William D. Boan, Grady A. Brown, Robert B. Brown, Danny M. Bruce, Milford D. Burriss, Marion P. Carnell, Cebron Daniel Chamblee, H. Howard Clyborne, M.J. Cooper, G. Ralph Davenport, Paul W. Derrick, Dick Elliott, John G. Felder, Tee Ferguson, B.J. Gordon, Jackson V. Gregory, Patrick B. Harris, C. Alexander Harvin, III, B. Hicks Harwell, D.N. Holt, Jr., Thomas E. Huff, Robert A. Kohn, Larry L. Koon, Thomas A. Limehouse, James G. "Jim" Mattos, Jennings G. McAbee, Frank E. McBride, Eugene Belton McLeod, Jr., Donna A. Moss, Thomas N. Rhoad, John I. Rogers, III, Robert J. Sheeheen [sic], Paul E. Short, Jr., Luther L. Taylor, Jr., John W. Tucker, Jr., Dave C. Waldrop, Jr., McKinley Washington, Jr., Juanita M. White, David H. Wilkins and Daniel E. Winstead.

added that if it was someone who was friendly toward his interests he would take care of them with a few hundred dollars. COBB emphasized that he did not know and did not care how they handled or reported the money. COBB's sole interest was to gain friends and supporters of his interests.

[Hearing, 10/18–20/95, Taylor Exh. 3].

This language from these three FD–302s is used by the FBI–Columbia Office almost verbatim in its Undercover Operation Proposal (UCO) dated September 5, 1989 [Taylor's Third Supp. Memo, 3/28/96, Exh. 1, p. 13], seeking authorization for this undercover operation. The government, therefore, was totally familiar with the existence of these 302s, yet it did not turn them over to the defendants for use at trial.

Reference in the above-quoted FD–302 of July 26, 1989, to payments being made to legislators "sometimes by check, either from his business or personal account," prompted requests from the defendants for Cobb's financial records. At the final hearing on the instant motions on October 3, 1996, testimony was elicited on direct examination of Mrs. Rhonda Collins [22] that the defendants were furnished with the records of Cobb's business account—Government Business Associates, Inc.—in or about May 1995. She stated that copies of nine (9) checks payable to various legislators in amounts between $100 and $650 [23] have been found in these records. Mrs. Collins further stated that the defendants had never been furnished copies of Cobb's personal financial records. The defendants argue that the nine checks in increments of $100 to $650 corroborate the information quoted above from the FD–302s of June 14, 1989, June 22, 1989, and July 26, 1989, and that this information would have

served to refute Cobb's testimony at the trials that the payments he made to these defendants were definitely known by them to be bribes. [See Hearing Tr., 10/18–20/95, pp. 56–66].

In its Post–Remand Memorandum, the government argues that the financial records of Government Business Associates were submitted to the court for *in camera* inspection and that the court's order of July 25, 1995, held that the government need not provide these records to the defendants, but that upon resubmission the court ordered that the records be provided to the defendants on September 7, 1995. It is the government's contention that this reflects the "less than clear nature of the discoverability of certain documents in this matter, especially these checks." A reading of this court's September 7th order, however, simply shows an admission by the court that it did not properly identify the photostatic copies of bank statements and canceled checks on this account in the first *in camera* submission of eleven file boxes of material under review. More importantly, however, the question is not why these records were not furnished in 1994 or 1995, but why they were not furnished to the defendants prior to their initial trials in 1990 and 1991.

In addition to the above, defendants cite to the withholding of 302s on James Faber, Frank Earl McBride, and Ennis Maurice Fant, all dated July 18, 1990, in which each of them stated they believed the monies they received from Cobb to be campaign contributions. [Taylor's Motion to Dismiss, 9/23/93, Exhs. 13–15]. These 302s were derived from interviews conducted by the FBI simultaneously with the FBI's initial interview of defendant Taylor.[24] All four of these defen-

---

22. Mrs. Collins is the wife of Taylor's attorney, Joel W. Collins, Jr. She is a graduate of Winthrop University and a former Trust Officer with South Carolina National Bank, now Wachovia. From time to time in the past she has been employed at Collins and Lacy, P.C., her husband's law firm. She has worked without compensation on Taylor's case continuously since its inception, primarily handling the organization of documents. The government did not oppose her qualifications to testify in this regard.

23. Also found in these records were copies of seven (7) checks payable to State Senator John Charles Lindsay of Marlboro County, South Carolina, including two (2) $10,000 checks and one (1) check for over $20,000. [Hearing 10/18–20/95, Taylor's Exh. 12].

24. Taylor was first approached about 9:00 a.m. on July 17, 1990, in the driveway of his home by three FBI agents. They requested that he accompany them to their offices. He was interviewed for approximately seven hours, during

dants (Taylor, Faber, McBride and Fant), as well as others, were approached in a "sweep" by the FBI of targets of the Lost Trust investigation and must have been considered all part of the same case. Even had the defendants not been able to utilize these 302s at trial as statements of unavailable witnesses, as argued by the government in its Post–Hearing Memorandum, it is the opinion of the court that these 302s should have been provided as relevant discovery material.

Cobb testified that after he had been set up by the FBI as a lobbyist for the bogus Alpha Group in order to catch legislators accepting bribes for their support of the pari-mutuel bill, he sought the help of defendant Taylor in recruiting black legislators and the help of Kohn in recruiting white legislators. Taylor argues in his memorandum of February 10, 1994, that taped conversations between Cobb and Kohn

> go to the vital issue of whether or not the government was running a sting to catch crooked legislators or whether, on the other hand, Cobb was trying to make it appear that he could buy votes from legislators other than Senator Lindsay in an effort to save himself from the consequences of numerous illegal acts for which he could be prosecuted.

[Taylor's Supp. Memo, 2/10/94, p. 9].

Taylor was a co-sponsor of the pending pari-mutuel bill and sat on both the Labor, Commerce & Industry Committee of the House of Representatives and the Banking and Consumer Affairs Sub–Committee. Prior to the institution of the sting operation, the pari-mutuel bill had successfully passed these committees. Taylor contends that his continued support of the bill was not an explicit *quid pro quo*. He argues that this is corroborated on a tape recorded conversation of January 16, 1990 (Tape # 14), on which

Kohn is heard to remark: "... we got the thing out of committee with no one doing anything..... No money, and you know, just, just doin' for the issue." [Taylor's Supp. Memo, 2/10/94, Exh. 9, p. 2]. Taylor further argues that this same tape shows that, in spite of FBI instructions to Cobb to be explicit about the *quid pro quo* aspect of his payments to legislators, Cobb felt the need to be far more subtle in his approach. In encouraging Kohn to bring supporters to him, Cobb instructed Kohn:

> You know how to, I mean you know how to work it and cover us, I mean, we don't want come over there and say well, here, they're gonna buy the damn thing.

[*Id.* at p. 4]

On an audio tape of April 5, 1990 (Tape # 75), Kohn tells Cobb:

> (UI)I'm not trying to hold back, I mean I realize (UI) I ain't trying to play that game. (UI)I've been asked for gold coins. If it doesn't look like money should be brought up, I don't do it to hold back money, I just don't think it's good to bring it up (UI). I use (UI) some of them I just casual comment about a contribution to their campaign 'cause see if you have to do that I can write a check and tell them I think their [sic] a good spirited citizen (UI).

[*Id.*, Exh. 12, p. 13]. The transcript of this tape is made a part of an FD–302, which states that this audiotape is of a telephone conversation Cobb has with a Wade "Ronnie" Crow,[25] followed by a meeting with Faber, McBride, Kohn, Taylor and one Rachel Harper. Taylor is shown to speak only once, and it is impossible for the court to ascertain whether he was present at the time the above statement was made by Kohn. His name, however, does appear in the cover

---

which time he admitted receipt of monies from Cobb that he considered to be campaign contributions. Late in the afternoon, Taylor acquiesced to appearing before the Grand Jury. He was not told he was a target of the investigation, was not given a *Miranda* warning before testifying, and was not asked in the Grand Jury how he categorized the monies he received from Cobb. Following his testimony, he was taken to a local motel where agents stayed with him overnight in shifts. Clemens testified at Taylor's trial

that Taylor was kept in FBI custody because they were concerned that he was depressed to the point of being suicidal. However, they also bought him a liter of Scotch whiskey, and it is curious they chose a known depressant, alcohol, to assist him through this "suicidal" state.

**25.** Wade Ronald Crow, who was indicted with House Speaker John I. Rogers, III, and pled to one count of aiding and abetting extortion under the Hobbs Act.

FD–302, yet he was not furnished this tape or the FD–302 and transcription prior to his trial.

These tapes, as well as the numerous other audio and video tapes furnished to the defendants on November 29, 1993, certainly must be viewed as exculpatory evidence which could have been used to further the defense put forth by these defendants that they considered the monies they received from Cobb to be campaign contributions.

In this order the court cites allegations primarily from the arguments, memorandums and exhibits of defendants Taylor, Blanding and Gordon. In fact, with regard to the timing of their trials and evidence not furnished to them for their defenses, their positions are closely related. Derrick was the defendant in the third Lost Trust trial, and some, although by no means all, of the previously withheld evidence was available to him and defendant Long for their trials.[26]

Defendant Derrick also presented additional testimony at his trial that the monies he received from Cobb were used to produce a semi-annual newsletter to his constituents. The government objected to the admission into evidence of a copy of the newsletter he had published in the spring prior to his indictment on the grounds that it had never received a copy of that newsletter, that it was hearsay, and that it was irrelevant. Paul Derrick affirmatively stated at trial that he had given a copy to the government. At a hearing on April 19, 1995, Derrick disclosed that "we have just recently discovered in the most recent documents an FBI 302. Guess what is attached to it? That news letter. They had it. . . . We didn't get to get that in during the trial." [Hearing Tr., 4/19/95, p. 37].

Defendant Long is presently before this court for a new trial granted him by this court, which decision was upheld on appeal. At the conclusion of the Long trial, this court dismissed one count against Long; however,

tapes ruled pertinent only to the dismissed count inadvertently had been allowed to go to the jury room. Long, however, has joined in the motions for dismissal on the grounds of prosecutorial misconduct as the motions may relate to him.[27]

At the motions' hearing in October 1995, Long cross-examined Cobb concerning his testimony at Long's trial that when Cobb gave Long the money in question in this case, Long had no idea that it was a bribe. The transcript from October 19, 1995, reads:

Q. That he would have thought that you were simply helping him out of his financial difficulties, and it was not related to any legislation pending in the South Carolina Legislature; is that correct?

A. That's correct, yes, sir.

Q. Specifically the pari-mutuel bill?

A. Yes, sir.

Q. And the pari-mutuel bill, as a matter of fact, was something that Bud Long had always supported; is that correct?

A. Yes, sir.

Q. As I understand it, it is your position that Bud Long never had the intent to accept a bribe?

A. That's correct.

Q. And that you led him to believe, or did not lead him to believe other than it was just some money from a friend to help him out of his financial difficulties?

A. He was in a tight, [sic] and he had been very valuable in assisting me in getting clients, and I had given Bud money from time to time, and he could very easily have thought that this was one of those situations. As a matter of fact, I think he even told me to make sure—I think he may have looked at it as a contribution, because he told me one time to make sure that I thank my people for the contribution.

---

**26.** Derrick has also pursued a defense of entrapment and cites in his memorandums and arguments to specific evidence that was withheld which he believes would have supported this defense. In light of the findings herein, the court need not address the entrapment issue.

**27.** Any grounds for dismissal of the indictment of Long, outside of those for prosecutorial misconduct, need not be addressed at this time.

. . . .

Q. Now, let me ask you this, which I was not able to ask at the trial, because I did not know about that until the trial, prior to the meeting ever being arranged or your discussion with Bud Long concerning this money, did you communicate to the F.B.I. that it was unfair to put Bud Long in that position, because of, number one, his financial difficulties; and, number two, because of your unique relationship with him, he would not understand and not realize it was a bribe?

A. Yes, sir, I did; also, to the U.S. Attorney's Office.

Q. This is prior to it ever coming about?

A. That's correct.

[Hearing Tr., 10/19/95, Vol. II, pp. 32–3].

Cobb further testified that in the time frame prior to the exchange of money with Long, he voiced the same concern to AUSA Alfred W. (Buddy) Bethea, SA Clemens, USA Daniel, and AUSA Barton; but, in spite of his protestations on more than one occasion, SA Clemens instructed him to go ahead and meet with Long. [*Id.* at p. 34]. He further testified that he repeatedly told AUSA Bethea, who was to be the lead prosecutor for the Long trial, that Long would have had no reason to believe that the money he was accepting from Cobb was bribe money. When asked for AUSA Bethea's reaction, he stated:

His reaction was one of he had made up his mind that Bud Long was guilty, he wanted to try him, he hadn't participated in any of the trials, and he was more gung ho, I think, about trying the case than anything else. We had a very strong disagreement in this regard.

[*Id.* at pp. 40–1].

When Cobb testified to the above on direct examination by AUSA John W. McIntosh at Long's trial, McIntosh personally refused to proceed with the prosecution; and USA Daniel, who had not been part of the trial prose-

cution team, replaced him for the balance of the trial.

### 2. *The Capital Gains Tax Investigation and Ronald L. Cobb.*

Cobb has been previously identified in this order as the government's key confidential informant employed in the sting operation. Cobb was a former member of the South Carolina State Legislature and a licensed lobbyist. He maintained throughout these cases that he was a close personal friend of Lindsay, who was undisputedly one of the most powerful men in State government. Lindsay was a member of the Senate Conference Committee appointed to negotiate the differences between the Senate and House versions of the 1988 Appropriations Bill, in which a capital gains tax "rollback" provision had been included as a "proviso."

Prior to his trial, Taylor had received a substantially redacted FD–302 of an interview of lobbyist J. Randal Lee by SA Clemens and SA Thomas J. Davis conducted August 14–21, 1990. [Hearing, 10/18–20/95, Gordon Exh. G]. Taylor argued that he was entitled to place Cobb's credibility before the jury and that to do so he would need to review documents he believed to be in the government's possession, and to be furnished the identity, which had been redacted from the documents furnished, of various elected officials to whom Cobb had made payoffs. A transcript of a pre-trial motions hearing on October 11, 1990, reveals Taylor's argument that "nothing is more relevant to this whole case than the credibility of Mr. Ron Cobb." [Hearing Tr., 10/11/90, pp. 37–42]. Apparently, the Fourth Circuit Court of Appeals agrees.[28]

Some six days prior to the Blanding/Gordon trial, the government turned over to those defendants the unredacted FD–302 dated August 14–21, 1990 [Taylor's Supp. Memo, 2/10/94, Exh. 7], which disclosed that Lindsay's name had been redacted in the version furnished Taylor. This 302 discusses

28. In its opinion dated May 29, 1992, in the *Taylor* case, the Fourth Circuit Court of Appeals stated: "The government argues that Cobb's testimony was not critical to its case and that his credibility was not a significant issue at trial, but a review of the transcript reveals that these arguments are ludicrous. Cobb was the cornerstone of the prosecution's case and his credibility was the paramount issue at trial." *USA v. Taylor,* 966 F.2d 830, 837 (4th Cir.1992).

at length the South Carolina Capital Gains Tax bill initiated in 1988 (the "proviso"), and puts the government on notice of alleged bribe payment arrangements involving Richard E. Greer, Chairman of the South Carolina State Development Board, Lindsay, Cobb, and various other persons.

Also during the Blanding/Gordon trial, on February 22, 1991, as the result of a court order of February 14, 1991, the government furnished the Blanding/Gordon defendants with an unredacted FD–302 of an interview of Cobb by FBI SA Arthur Richards dated May 1, 1989, which revealed Lindsay's involvement in payoffs regarding legislation known as the Oil Jobbers bill. At a hearing on Blanding and Gordon's motions to dismiss for prosecutorial misconduct filed on February 25, 1991, and heard February 28, 1991, Richards confirmed under oath Cobb's understanding that the debriefing on May 1, 1989, concerned "payoffs and kickbacks and extortion. We were talking about payoffs." [Gordon's Motion to Dismiss, 2/22/93, Exh. C, p. 120]. Richards testified that he debriefed Cobb prior to and after he administered a polygraph examination. On direct examination by Gordon, Richards related that Cobb initially failed the polygraph test he was administering to him concerning the Oil Jobbers bill, testifying as follows:

A. .... He [Cobb] said that through an intermediary, that he initially would not identify, he paid Representative Mangum [sic][29] $10,000 in order to get his vote. That was the first issue that I polygraphed.

Q. Okay. Now the issue that you polygraphed him on was whether or not he in fact paid representative Mangum the $10,000 through the intermediary.

A. That's correct.

Q. All right, sir. And he tested truthful on that?

A. He did not. He failed that polygraph examination.

Q. What happened after that?

A. Then after he failed it, he was confronted with the fact that he had failed it. And he said that he had—that there was

another person involved, this intermediary, and that that intermediary also got some money. But he would not at that point, without certain assurances, would not disclose the identity of the intermediary.

. . . .

Q. And because he hadn't divulged to you that there was another party involved, Senator Lindsay—

A. Exactly.

Q. —he showed deception?

A. He showed deception. At that point, I put him on the telephone with Agent Clemens, and together they worked out an arrangement where the government, if he gave us the identity of the intermediary, where the government would not use his statement against that intermediary,....

. . . .

A. Okay. After it was worked out and it was agreeable to Agent Clemens and agreeable to Mr. Cobb, at that point he wrote down "Jack Lindsay" on a sheet of paper. I'm talking about Mr. Cobb—showed it to me, and then crumpled the piece of paper up and threw it in the trash can.

. . . .

Q. And when you tested him about the payoff to Representative Mangum, after he divulged to you that Senator Lindsay was the intermediary, how did Mr. Cobb do?

A. He passed the second test.

[*Id.* at pp. 111–19]. This testimony alone refutes the government's argument that "Cobb has consistently adhered to his subjective view of the facts during the investigation . . . [Gov's Post–Hearing Memo, 10/18/96, p. 23], and that "the defendants do not and cannot show perjury by Cobb as to his subjective beliefs, . . . [*Id.* at p. 26].

At this same hearing on February 28, 1991, Gordon furthered the argument that, if the government had any 302 regarding Cobb's payoffs to Lindsay, the defendants were entitled "to know if they have talked to

**29.** The late Thomas Magnum, a member of the South Carolina House of Representatives.

Mr. Cobb and he's indicated these illegal payoffs." To this, the government replied: "... if he's looking for the secret 302 of Ron Cobb where this is discussed, *it does not exist.* There is no such 302 concerning that.... But there are no 302's or statements from Cobb concerning this particular instance involving capital gains tax." [*Id.* at p. 11–2].

At this hearing, SA Clemens was also examined under oath by Gordon as to the existence of any FD–302s Clemens might have prepared concerning Cobb's involvement with capital gains. The record reads as follows:

Q. Mr. Clemens, I know you said you only briefly discussed it, but apparently y'all had some discussion about Ron Cobb's involvement with the capital gains tax legislation. Did you do a 302 or anything concerning that debriefing of Mr. Cobb?

A. No.

Q. Do you have any rough notes of it?

A. No....

[*Id.*, Exh. D, p. 36–7].

Mr. Barton concluded on this subject with the statement: "There are three 302's and two volumes of Grand Jury testimony, that is the only thing that the government has from Mr. Cobb." [*Id.*, Exh. C, p. 18]. As mentioned elsewhere in this order, copies of checks from Cobb's business account payable to Lindsay were also in possession of the government, but they were not furnished to the defendants at that time. Although Cobb testified that he sometimes wrote checks to legislators from his personal account, there is no evidence the government ever sought to obtain these records.

On November 29, 1993, following remand of these cases for retrial, the government furnished for the first time an FD–302 of an interview of Cobb by SA Clemens dated September 25, 1989, in which the payments to Lindsay by Cobb with regard to the capital gains tax bill were characterized as "payoffs." This is the "secret" FD–302 that's

existence was previously denied by the government. This 302 was found by defendants in the November 29, 1993, discovery in a file marked "KOHN 1" and is one of the two undisclosed 302s on which the Office of Professional Responsibility (OPR) Report focused.

The defendants take the position that SA Clemens' testimony that he had never prepared such a 302 was perjury and that the prosecutors were fully aware of the existence of that 302 and allowed the testimony to stand. SA Clemens explained to OPR investigators that he "forgot it ever existed", calling it a "garbage 302," [Hearing, 4/19/95, Defs. Exh. 45, pp. 32–3] and the government argues that this testimony should be excused inasmuch as this was Mr. Clemens' first time to testify at a trial. This is refuted by the defendants' argument that every witness is expected to tell the truth, regardless of whether or not it is their first time to testify.[30]

During the OPR investigation, it was disclosed that rough notes of the interview which led to the 302 of September 25, 1989, had been taken by SA Clemens to his home in the Washington, D.C., area when he was promoted and transferred to FBI Headquarters from Columbia, S.C.[31] These notes were eventually provided by Clemens to the OPR in 1994 during its investigation.

For this and several other infractions of FBI regulations, SA Clemens received a letter of censure, a five-calendar-day suspension, and six months' probation.

At the Taylor trial, Cobb was asked on cross-examination:

Mr. Cobb, I want you to tell me right now whether or not you have ever given bribes or illegal money to Senator Lindsay?

Answer: No, sir, I have not given Senator Lindsay any bribes or illegal money.

[Taylor Trial Tr., Vol. 3, p. 56].

The defendants argue that the government knew at that point in time that Cobb was

---

30. Defendants further contend that SA Clemens, in fact, had previously testified at an evidentiary hearing in open court.

31. These notes were among other Lost Trust investigation work papers Clemens maintained at his home in the Washington area.

committing perjury and they allowed this perjurious testimony to stand and to continue throughout the subsequent trials.

The government responds that, although it may have believed the payments of monies by Cobb to Lindsay were illegal, that Cobb's testimony could not be considered perjury because Cobb, himself, did not believe the monies to be illegal. The evidence now shows, however, that Cobb not only discussed payoffs in connection with the capital gains tax bill with SA Clemens, with Greer, and in the presence of Randy Lee, all of whom knew that the Cobb payments to Lindsay were, in fact, illegal, but he admitted to SA Richards on May 1, 1989, that he paid $20,000 in illegal monies to Lindsay and Magnum for their influence in passing the oil jobbers bill.

Also in the record is a sworn Affidavit from SA Ronald L. Dick, who acted as the supervising agent at FBI–Columbia for much of this investigation, which affirms defendants allegations that the government was totally aware of the nature of the Cobb payments to Lindsay. In his Affidavit, Dick states:

> I recall the subject of the capital gains tax bill. My recollection is that there were other cooperating witnesses who were providing information regarding this issue. However, Cobb would never allow the payments Cobb made to state senator Jack Lindsay to be characterized as bribes. My position on this matter was similar to the old saying that if it walks like a duck, talks like a duck, and looks like a duck, then it must be a duck. After listening to Cobb try to characterize the payments made to Lindsay as anything other than bribery, I remain unconvinced. As an FBI agent, it was clear to me that the monies paid to Lindsay by Cobb were in violation of the Hobbs Act. Cobb, however, would never allow these transactions to be characterized as bribes. This was the subject of much discussion between SSA Clemens, myself and the USAO Office.

[Dick Affidavit to DOJ/OPR, 7/12/94].

A review of the UCO for the Lost Trust sting operation, then code-named Phaedrus, prepared by FBI–Columbia in September 1989 [Taylor's Third Supp.Memo, 3/28/96, Exh. 1, p. 10], reflects that almost the identical wording was used in the UCO as that in SA Richards' FD–302 of May 1, 1989. [Hearing, 10/18–20/95, Taylor Exh. 2]. The names of both then-Supervising Agent in Charge James F. Denton, III, and SA Clemens appear on the Airtel which transmitted the UCO to FBI Headquarters.

The government maintains that it was absolutely necessary to redact Lindsay's name from both SA Richard's FD–302 of May 1, 1989, and from Randy Lee's FD–302 of August 14–21, 1990, to protect an on-going investigation. However, it is difficult to reconcile this reasoning with SA Clemens' interpretation that Cobb's reference to pay-offs to Lindsay were part of a "garbage 302" or with the testimony of SA Dick. Furthermore, the FBI relied in part on this information for authority to instigate the entire sting operation. The court simply cannot disregard Lindsay's prominent position in the politics of South Carolina and the obvious importance to both the FBI and the AUSO of information that he was involved in corruption. The explosive nature of that information, as well as information that Rogers, the Speaker of the House, and Greer, the Chairman of the State Development Board and, undisputedly, a close friend of Governor Carroll A. Campbell, Jr., were also involved, is revealed in an August 28, 1990, teletype sent from FBI–Columbia to FBI–Headquarters which requested authority for lobbyist Randy Lee to utilize electronic recording devices to monitor anticipated conversations with Greer. Greer, Lindsay and Rogers are the captioned subjects. That teletype reads in part:

> This request will require DOJ authority as sensitive circumstances exist in that captioned subjects are members of the South Carolina Legislature and high ranking State government employees. Three CWs hereafter referred to as CW–1 [Lobbyist Lee], CW–2 [Senator Lee] and CW–3 [Cobb] have provided information that bribe payments were made to South Carolina State Representatives John Irby Rogers, III, and South Carolina State Sen-

ator John Charles Lindsay, in order to ensure the passage of certain capital gains tax legislation in the State of S.C. during the 1988–1989 legislative session.

. . . .

AUSA John Barton is aware of the facts of this case and fully concurs with the use of consensual monitoring. Entrapment is not an issue based upon the facts obtained thusfar [sic].

[Hearing, 10/18–20/95, Gordon Exh. T].

These were "big fish," yet on February 28, 1990, Clemens testified concerning debriefings of Cobb about the capital gains tax matter that he had only "talked to him for a short period of time to get a general—general idea of what had gone on." [Gordon's Motion to Dismiss, 2/22/90, Exh. D, p. 37]. AUSA Barton was handling the discovery for the Taylor trial, and any 302 mentioning any one of these three subjects would certainly have been noticed by him, yet he denied the existence of the "secret 302."

At the Taylor pretrial hearing on October 11, 1990, and, in fact, at the subsequent hearings and trials in the entire Lost Trust matter, the court relied on the repeated representations by the government as officers of the court, that all the discovery to which the defendants were entitled had been turned over to them. The court is shown to have advised Taylor at his pretrial hearing: "Well, based on what Mr. DuTremble tells the court, you know, I don't know that they have anything else to give you, sir." [Taylor Trial Tr., p. 54]. The court then stated:

. . . when he [the United States Attorney] answers them [*Brady* motion requests], and he's an attorney, signs his name down there, you know, just because he is a United States attorney, doesn't stop him from being an attorney, then I accept that just like I do any other attorney's signature. And they know what the ramifications are if they don't—done in accordance—.

[*Id.* at p. 59]

Just prior to Cobb's testimony at the Taylor trial, Taylor received a copy of Cobb's agreement with the FBI, the USAO, and the Office of the Attorney General of South Car-

olina. Taylor renewed his Brady motion that he be provided the actual details of all the crimes for which Mr. Cobb had been immunized under this agreement. The court, assuming that the government had disclosed all it had a duty to disclose, addressed Taylor's counsel as follows:

. . . you know as much about the government's case as the government knows. Supposedly they have given you everything they have short of which they have not told you which witnesses they are going to call and what have you. Other than that, you have everything they have. I just don't know what it is you think I can do about it.

[*Id.* at p. 9]. Taylor, at this point in time, however, had none of the government's evidence of Cobb's pay-offs to Lindsay.

At the February 28, 1991, hearing, after AUSA Barton's denial of the existence of the "secret" 302, the court admonished:

. . . all I can do is take them at their word, because they have always performed like most officers of the court do . . . . And Mr. Barton just said there are no 302's dealing with these matters which you talk about. And we are all aware that there are all kinds of ongoing investigations, and I'm sure if they already had them, he would have them and he would at least tell me that he had them and give them to me to look at and see if I thought he ought to have to give them to you.

[Gordon's Motion to Dismiss, 2/22/93, p. 14].

Later in that same hearing, the court stated:

I have already told them to give you everything they have, and I don't know how I can do better than that. Now, if you find out they didn't give you what they had, then I will take appropriate steps there.

. . . .

Mr. Barton has been trying to tell us from the time we got started, kept standing up and I kept sitting him down, and then I was confident he was going to say, "*We have given them everything we have,*" and

that is what he eventually said. [Emphasis added].

[*Id.* at p. 17].

Although the record will reflect that other questionable government conduct surfaced with regard to the handling of the Lindsay matter, the government's problems with Lindsay's involvement were mooted by his death. Rogers eventually pled. The record as to Greer, however, must be addressed.

### 3. *The Capital Gains Tax Investigation and Richard E. Greer.*

Greer was initially implicated in the Lost Trust investigation by the August 1989 FD–302 of lobbyist Randy Lee. Lee's FD–302, which resulted from interviews conducted by the FBI on August 14 through 21, 1990, reads in pertinent part as follows:

> LEE stated he recalled GREER saying "It is very big, it is important to a lot of people—it would help a lot of the Governor's friends." Lee stated that as the conversation continued, it became obvious to him that GREER had arranged for several wealthy individuals, who were staunch supporters of Governor CARROLL CAMPBELL, to invest a large amount of money to affect the rollback. LEE stated the money to be invested by several of the participants, arranged by GREER, would be paid as a bribe to insure that the rollback would take place.... LEE stated he learned that ROE, BRASIER and possibly a third party, had been quoted a fee of seventy-five thousand dollars each, by GREER. LEE stated he either heard GREER mention this amount during the initial conversation, or at a later date; however, it was later explained to him by COBB. LEE stated he has never been certain whether or not the third unidentified individual was to pay a particular sum of money; however, he was certain that GREER had arranged for COBB and Senator JACK LINDSEY [sic] to receive one hundred fifty thousand dollars from ROE and BRASIER in the event they were able to affect the rollback of the

Legislation, which was disguised as a "proviso" within the Appropriations Bill. [Taylor's Supp.Memo, 2/10/94, Exh. 7].

It is undisputed that USA Daniel and possibly SA Clemens, met with Greer and his attorney in Charleston, S.C., sometime in December of 1990. The defendants made repeated inquiries concerning the existence of a 302 or rough notes of this meeting. In its memorandum of October 18, 1996, the government reiterates that no such 302 exists and contends that the circumstances of that meeting "suggest that no 302 would have been done." [Gov's. Post Hearing Memo, 10/18/96, p. 35]. What the memorandum does not address, however, is Greer's testimony that he was interviewed "numerous" or, at least, "several" times [Hearing Tr., 10/20/95, Vol. III, p. 342]. Although his testimony of the precise number of interviews, the time frame of each, and the place of each interview was never made completely clear, Greer stated that on at least two occasions subsequent to the initial meeting he was interrogated extensively by the FBI for several hours. *Id.* at pp. 362–6. A 302 of one interview with Greer in April 1991 dealing exclusively with his drug usage was furnished the defendants in discovery. If Greer testified truthfully that at one or more of these interviews he discussed the capital gains tax issue and his willingness to testify against Lindsay, then it would appear to the court that at least one 302 should have been prepared in connection with capital gains.

Greer pled guilty to a drug charge and was sentenced by this court in July of 1991. At his sentencing hearing, the government argued for a downward departure from Greer's sentencing guidelines; and SA Davis, in the presence of USA Daniel and AUSA Barton, stated to the court:

> Your Honor, last Christmas, the FBI approached Dick Greer for the first time in connection with our drug investigation of Mr. Greer. This was prior to the Jack Rogers indictment. At that time Mr. Greer provided us with information concerning the capital gains tax investigation. Mr. Greer essentially told us that Lobbyist Ron Cobb had approached him and told him that he needed more money to pay off

both Jack Rogers and Senator Jack Lindsay in connection with the capital gains tax bill. He told us this is the first time that he knew that Ron Cobb—that what he was doing was illegal.

Mr. Greer was willing to testify against Mr. Rogers should he have been brought to trial and was in fact scheduled to testify against Mr. Rogers. Also Mr. Greer was willing and scheduled to testify against Senator Jack Lindsay in connection with this investigation. I think the investigation certainly would have resulted in an indictment should Mr. Lindsay have lived. [Hearing, 10/18-20/95, Gordon Exh. M, p. 13].

AUSA Barton informed the court at that same hearing:

... we were able to bring the people in there and determine that other than Ron Cobb, Jack Lindsay and Jack Rogers, there was no illegality with any piece of capital gains legislation. That illegality was only applicable to the retroactive affect of capital gains and had nothing to do with what the governor's number one priority of the Legislature was, changing the perspective (sic) capital gains rate. We find other than, as I described to you, Cobb, Lindsay and Rogers, we find no corruption, no undue improper influence, no money changing hands with regard to any of the capital gains bills.

[*Id.* at p. 11].

During the arguments for a downward departure for Greer, it became apparent that this court was poised to deny the motion, and AUSA Barton requested an *in camera* hearing to furnish the court with additional information. It was at this *in camera* proceeding that USA Daniel and AUSA Barton presented, in some 16 pages of transcript [*Id.*, Exh. L, pp. 34-49], the argument to the court that Greer had been of invaluable assistance to the government in explaining that two capital gains tax bills were before the Legislature, a "retrospective" or "rollback" capital gains tax bill and a "prospective" capital gains tax bill; that Greer had clarified the difference between the two, and that it was the passage of the "prospective" bill in which the Governor and his staff were actively engaged. USA

Daniel and AUSA Barton informed the court that the information given the government by Randy Lee had been misleading and that it was Greer who was able to put the government investigation on the proper course that led the government to close its investigation on capital gains. In this regard, it is interesting to note that SA Davis, who, with SA Clemens, was present at the December 1990 meeting, told the OPR investigators that the first time he and Clemens ever heard this explanation of the "prospective" bill was at the Greer sentencing. Davis and Clemens were the two FBI agents most involved in the Lost Trust investigation.

The defendants allege that Greer perjured himself before the Grand Jury and in the presence of USA Daniel. In the interim between the Christmas 1990 meeting with Greer and his sentencing hearing in July 1991, Greer testified on May 23, 1991, before the Grand Jury; and, in response to inquiry from AUSA Barton, he testified:

Q. Were you aware of any monies paid to any legislators in [an] effort to influence their vote in connection with the capital gains rollback bill?

A. No.

Q. How about in connection with the Governor's change, the bill that was his priority?

A. Absolutely not.

[*Id.*, Exh. K, pp. 14-5].

It is obvious from the government's argument for a downward departure for Greer that Greer had knowledge as early as December of 1990 that payoffs had been made by Cobb to Lindsay and Rogers. USA Daniel, who was present at the Christmas 1990 meeting, and who was, or should have been, privy to information given at other debriefings of Greer, was also present when AUSA Barton questioned Greer before the Grand Jury. Daniel did nothing to correct Greer's testimony that he was not aware of any illegal payoffs to legislators. AUSA Barton, in his interview with the OPR, provides the speculation as to why Greer responded as he did to the subject question before the Grand Jury. He opines that Greer might have felt justified in a negative response to the word-

ing "*Were* you aware ...," whereas a positive response would have been forthcoming to the question had it been phrased "*Are* you aware...." Greer's later statements in the record would tend to confirm that suggestion. This play with semantics, however, appears to the court to be totally without merit.

In spite of the government's reliance at Greer's sentencing on the information given by Greer, no notes or FD–302s or written memorandums of any kind have surfaced of any debriefings of Greer with regard to capital gains.

Also, in its *in camera* argument for Greer's downward departure motion, the government asserts that it was Greer who provided the names of those persons who could testify before the Grand Jury in support of Greer's version of the capital gains tax bills. The government states in its October 18, 1996, memorandum that "the evidence showed that the government actively pursued the three identified subjects of that investigation [capital gains]: Dick Greer, Lindsay and Jack Rogers." [Gov.'s Post–Hearing Memo, 10/18/96, p. 27]. The court disagrees. Greer, himself, was never polygraphed and no FD–302s or other written memorandums exist. The government further affirmatively states that Greer did not receive money in connection with capital gains legislation. [*Id.* at p. 28]. There is nothing is the record to show that the government's "active pursuit" of Greer included a review of Greer's financial records. It appears that the government simply accepted Greer's version of events and characterized the information given by Randy Lee as "speculative" and "misleading." Although at the Greer sentencing hearing it was indicated that the government was "misled" about the capital gains matter by this information, Randy Lee was the beneficiary of a downward departure motion by the government at his sentencing hearing on January 13, 1992, based on his substantial assistance to the government. The court has difficulty in reconciling the government's position—that Mr. Greer's "substantial assistance" served to

correct its misconception about the capital gains tax bills and allowed it to put the capital gains tax investigation to rest—with its position that Randy Lee provided them with "substantial assistance," when it now claims Lee misled them into a lengthy and expensive investigation.[32]

Further, at the sentencing of Lost Trust defendant Senator William Richard Lee on December 3, 1990, the government requested an *in camera* hearing for its argument in support of its downward departure motion. At that time, AUSA Barton stated:

> Your Honor, specifically after Mr. Lee gave us those revelations about the push that was put on we started looking at some of the individuals who we had some suspicion about and specifically I would anticipate the government seeking an indictment against Representative Rogers, probably this month, for the acceptance of money in connection with his vote and work on the capital gains bill. There is substantial information about Senator Lindsay as well and his acceptance of money for his vote and support in connection with the capital gains bill.

> So based on what Mr. Lee gave us and the sort of a kick-off, if you will, we caught the ball and ran with it and have run into some pretty good areas that will very definitely result in charges brought against—I can affirmatively represent to you against Representative Rogers as a result.

[Hearing, 10/18–20/95, Gordon Exh. J, p. 4].

Senator Lee informed the court, *in camera*, through his attorney, that he was present at a meeting of Republican legislators with the Governor and his staff in the spring or early summer of 1988 where he was told

> to back this bill. It is the most important piece of legislation to the governor's office for this legislative year. If anybody raises a question about it, you are to sweep it under the rug. A list was given to him on

---

**32.** The court is aware that the government claims that Lobbyist Lee was helpful to them in the Derrick case.

how to handle any tricky or difficult questions, a script.

[*Id.* at p. 9]

If the reference by the Governor's Office to this "most important" legislation was a reference to the "prospective" capital gains tax bill as described by Mr. Greer, and not to the "retroactive" proviso in the Appropriations Bill, which allegedly would have been extremely beneficial to some of the Governor's friends and contributors, what would have been the need to "sweep under the rug" any tricky questions.

The information provided by Senator Lee is consistent with the FD–302 of Lobbyist Lee wherein he referred to a meeting the Governor had with Republican representatives sometimes after early May 1988 in which an "answer sheet" was distributed to the attendees.

A discussion of the capital gains tax investigation would not be complete without mention of a bizarre incident which came to light during the OPR investigation. Prior to the OPR investigation, the transcripts of four of the five persons who testified before the Grand Jury with regard to capital gains [33] disappeared from a file cabinet at the U.S. Attorney's Office and later appeared, unexplained, in AUSA Barton's desk drawer. This disappearance has never been explained or, to the court's knowledge, ever been fully investigated.

### 4. *Visit by Cobb and SA Clemens to Home of Steven H. Smith and Telephone Call to Lindsay.*

Subsequent to the drawing of the Blanding/Gordon jury and prior to the commencement of opening statements, early on the morning of February 27, 1991, defendants filed a motion to dismiss for prosecutorial misconduct and requested an *in camera* hearing out of the presence of the government in order to proffer certain information. The hearing involved the unredacted copy of a 302 by SA Richards on May 1, 1989, only received by defendants Blanding/Gordon on

February 22, 1991, which defendants alleged substantiated that Cobb not only committed perjury at the Taylor trial, but that the government was aware that he was testifying falsely. [*See also,* § V–2 of this order]. The motion further involved the defendants allegation that Cobb committed perjury before the Grand Jury with regard to his drug usage, and that information substantiating that charge only came to light as the result of *Brady* material furnished the defendants by an order of the court on February 14, 1991. In setting out these allegations, Gordon's attorney then addressed the information he wished to proffer concerning conversations he had over the previous two days with defendant Taylor's attorney. After some discussion about how the information should be handled, the court called for Taylor's attorney, as an officer of the court, to appear before the court and make a statement. In his statement, Taylor's attorney recounted how, through a Columbia attorney, Dwight Drake, he had learned that Cobb and an FBI agent had visited the home of a Steven Harley Smith in the early morning hours just prior to Taylor's trial. He stated he recognized the impact this incident could have on the Blanding/Gordon trial and had contacted Gordon's attorney. He stated that several attempts had been made to contact Smith, and that he learned through Drake that Smith was reluctant to get involved. His statement included the following as having been told to him by Dwight Drake:

And he said that Mr. Ron Cobb and an FBI agent—and he did not name the FBI agent, but he said an FBI agent brought him—that the two of them came by Steve Smith's house. He said that they—they had a conversation wherein they acknowledged that Senator John Lindsay of Bennettsville was very ill and that his wife was restricting his telephone calls and that it was difficult for just anybody to call and speak to Senator Lindsay.

And they knew that Steve Smith was a very close friend of Senator Lindsay, and according to Mr. Drake Steve Smith was asked by Ron Cobb, or the FBI agent, or

---

**33.** The only Grand Jury transcript regarding capital gains not removed from the AUSO's file cabinet at this time was the transcript of Greer's testimony which had been previously pulled from the files.

both, to place a call down to Bennettsville to the Lindsay residence, and using his friendship, they felt sure he could get through to Senator Lindsay, that his wife would let him talk, and apparently that is what did occur.

And according to Dwight, who told me this now, the 25th, there was a conversation between Mr. Cobb and Senator Lindsay which he overheard at least one end of. And it had to do with how he should characterize some money that had been given by Ron Cobb to Senator Lindsay.

And apparently there was some discussion about whether that money could be characterized as a legal fee. And at the end of the conversation, you know, they left.

[*In Camera* Hearing Tr., 2/27/91, pp. 31–2].

The following day, the hearing continued *in camera* with the attorneys for the government present. In addition to testimony of SA Richards as to the circumstances surrounding his 302 of May 1, 1989, and the testimony of both Cobb and SA Clemens as to Cobb's drug usage (both issues being addressed elsewhere in this order), both Cobb and SA Clemens testified with regard to the visit to the Smith home.

The exchange on direct of Cobb by Gordon reads as follows:

Q. If the monies that you gave Senator Lindsay were legitimate fees, then why did you have to make a deal that you wouldn't have to testify against Senator Lindsay? What had he done wrong, if there were no illegal monies passed to him.

A. Well, from—from my interpretation of the conversation with the FBI, they had other things going that I wasn't aware of.

Q. Well, Mr. Cobb, if you weren't aware of them you couldn't testify about them, could you?

A. That's correct.

Q. So, that couldn't have been the reason for your agreement with the FBI that you wouldn't have to testify against Senator Lindsay?

A. Well, obviously, I told—obviously I told them the truth about the Magnum

thing. And from their vantage point that would be a problem for Senator Lindsay.

Q. So, now, the FBI told you it was a problem for Senator Lindsay?

A. No, they didn't tell me it was a problem, this is my own—I say that, I'm thinking this. Remember, this is back nearly two years ago when—you know, you are refreshing me through this stuff.

Q. I understand that. I don't have any problem with that. We will take as long as it takes.

Before you agreed to talk to the FBI about anything, you told them, "I'm caught, I will cooperate, I will talk to you about political corruption, but I won't testify against Jack Lindsay," did you not?

A. I won't do anything against Jack Lindsay, that's correct.

Q. And that included testifying?

A. That's correct.

Q. If you had not done or committed any illegal acts with Jack Lindsay, or if you had no knowledge of Jack Lindsay participating in any illegal acts, it wasn't necessary for you to have that agreement with the FBI, was it?

A. My agreement was that I didn't have to testify against Senator Lindsay. Now, as to anything that he had done—I know what you are getting at—as far as anything that he had done, no, I'm not aware of it, but had there been I wasn't going to be involved in doing anything against the Senator.

. . . .

Q. And how did it come about that you contacted Senator Lindsay?

A. Because the $10,000 to Magnum was—I was going to have to testify to that in court. Senator Lindsay was laying up in the hospital bed dying, and I called. I'm—I had a very close personal relationship with him, and I know this is going to hurt him. And I don't want to hurt him, for this to come out, so I was going to minimize it.

. . . .

And I couldn't tell him about it, so I got Mike Clemens to, because I couldn't tell him what I was going to testify to and I didn't. Mike Clemens told him what was going to come out, and so it prepared Senator Lindsay for what was going to come out.

Q. Isn't it a fact, Mr. Cobb, that the reason you called Senator Lindsay was to determine how you should characterize the $10,000 you gave to him?

A. That is absolutely not true.

[Gordon's Motion to Dismiss, 2/22/94, Exh. E, pp. 22–8].

The hearing transcript of February 28, 1991, will show that SA Clemens testified about that call to Lindsay on direct by Gordon as follows:

Q. And y'all were discussing the fact that Mr. Cobb would probably be cross-examined concerning this $10,000 payoff that he had made to Representative Magnum through Senator Lindsay, correct?

A. That's correct.

Q. And the $10,000 that he gave Senator Lindsay to deliver the money to Representative Magnum?

A. The monies he had paid Mr. Lindsay, yes.

Q. And during that discussion, Mr. Cobb indicated that he needed to go call and explain to Senator Lindsay what was going on, is that how it came about?

A. Pretty much. . . . He wanted to make sure that Mr. Lindsay was aware that it was going to come out.

Q. And Mr. Cobb was concerned that Mr. Lindsay, Senator Lindsay would find out that he, Mr. Cobb, had told the government that he had made these different payoffs to Senator Lindsay, correct?

A. He was concerned about that information, yes.

[*Id.*, Exh. D, pp. 24–5].

The record in the Taylor case was supplemented with the *in camera* proceedings in the Blanding/Gordon case, and at a motion hearing to reconsider Taylor's bond pending appeal held April 11, 1991, the court allowed Taylor to present the testimony of Steven Smith, who appeared under subpoena. In his testimony, Smith confirmed that he received a telephone call and a subsequent visit from Cobb and SA Clemens during the early morning hours of October 17, 1990. He stated that "the Senator was not receiving telephone calls from basically anyone at the time. However, due to our friendship and closeness he would accept phone calls from me." He testified that due to the early morning hour he called the Senator's son and asked him to have Lindsay call him. In a further recitation about what transpired that night, Smith testified:

A. Well, what was occurring is this. Mr. Cobb was insistent upon—and this was the problem which was being addressed. Mr. Cobb when he arrived was insistent upon labeling any exchange of money which was to be brought up in testimony or questions in the case, Mr. Cobb intended to call that a legal fee. Whether it was or wasn't I don't know and was not familiar at the time with what exchanges of money they were talking about.

Mr. Clemens was insistent to Mr. Cobb that he not label it a legal fee, but that he—I believe the term to be used was call it what it was. Now, that can't be quoted, but Mr. Clemens was trying to move Mr. Cobb away from the legal fee label to what Mr. Clemens thought to be the truth.

Mr. Cobb was resistant to doing that and was very upset that he was being asked to do that. It looked like, sounded like to me when he got there that Mr. Clemens had prevailed in his persuasiveness but Mr. Cobb had placed upon that as a condition or said he would do it if Senator Lindsay gave him the okay or that he knew that Senator Lindsay would not be upset with him for doing that. The purpose of the telephone call was to get Senator Lindsay on the phone so that Mr. Cobb could talk to him and hopefully seek that permission so that Ron could be convinced to go ahead and tell what Mr. Clemens thought was based on whatever information it was they thought to be the truth.

.... When Ron hung up the phone what he said was he told me—and I think this is accurate. Again, it is the middle of the night—something to the effect, "To do what I had to do."

....

A. That evening sitting in the breakfast room.... I asked him I said, "Ron, what is all of this about?"....

He told me then. He said, "I told you, Steve, they had us jammed up on the oil jobbers bill."

[Taylor Bond Hearing Tr., 4/11/91, pp. 20–1, 26].

Mr. Smith again testified under subpoena on October 18, 1995, at a hearing on the instant motions to dismiss:

A. The issue between Mr. Cobb and Mr. Clemens was the testimony that Mr. Cobb was to give I believe the following day, if my memory is correct, in a trial, with regard to how Mr. Cobb would classify monies that were alleged to have been passed between Mr. Cobb and Senator Lindsay. I don't know what the monies were or anything, but they called them monies.

Mr. Cobb was intending to, as related to me, and Mr. Clemens related that as well at some point during our conversation, that Mr. Cobb was going to classify whatever those monies were as an attorney's fee and that he had been authorized to do that by the United States Attorney.

[Hearing, 10/18/95, Vol. I, pp. 221–2].

Smith's appearances before this court on these two occasions were under subpoena and his testimony was consistent. And, although Mr. Smith's opinion of the events was that SA Clemens was attempting to persuade Cobb to tell the truth when he testified, it also indicates that SA Clemens, himself, was not entirely truthful in his testimony at the hearing on February 27, 1991, when he described the purpose of the visit as one only to give information to Lindsay. Further, it indicates that Cobb also was not truthful in his

testimony at the February 1991 hearing. The court must agree with the defendants' assessment that Lindsay was no stranger to publicity, and a notice to him that his name might appear in the media as a result of Cobb's testimony would certainly not warrant a telephone call to a dying man in the middle of the night. The involvement of an FBI agent in this entire incident was—and is—shocking to this court.

Equally shocking is Cobb's testimony during the hearing on these motions on October 19, 1995. As a result of Smith's testimony that there was an argument between Cobb and SA Clemens as to whether Cobb would "classify whatever those monies were as an attorney's fee and that he had been authorized to do that by the United States Attorney," the defendants called Cobb as a witness. Taylor on direct queried:

Q. Mr. Cobb, my question to you is, did the United States Attorney tell you that you had his permission to label moneys that you had given Mr. Lindsay as legal fees?

A. I had indicated to them that I would call the moneys anything they wanted me to call it, but I won't call it a bribe, and the terminology legals [sic] fees or contributions came up, and it was discussed, and I wasn't told not to use it.

Q. Mr. Cobb, didn't you tell us in Mr. Spears'[34] office that you had a conversation with the U.S. Attorney and that he had told you it would be all right for you to call any money you gave Senator Lindsay a legal fee?

A. Mr. Collins, that was in the course of our conversation, and as you will recall, we discussed that for a little while and I think I relayed to you that it was discussed, and I wasn't told not to, nobody ever said, you know—nobody ever said, say this, or say that. I implied that I wouldn't say that it was a bribe, and they indicated that I could call it something else, and a legal fee was one of those terms.

34. Michael E. Spears, an attorney representing Cobb at that time.

. . . .

Q. . . . . Mr. Cobb, did Mr. Daniel, former U.S. Attorney, ever tell you that it was all right with him for you to call any moneys you gave Senator Lindsay legal fees?

A. It's really tough to answer that yes or no, without explaining—

. . . .

THE WITNESS: In course of conversations, the terminology, legal fees, came up. It was maybe suggested that that would be a possibility, because I was adamant about not calling any moneys I gave Senator Lindsay bribes, which I didn't, and don't to this day, but, yes, the term legal fees, by the U.S. Attorney was mentioned as something I could call it.

[Hearing Tr., 10/19/95, Vol. II, pp. 24–5].

On cross-examination by the government, the exchange with Cobb on this subject continued:

Q. Did Bart Daniel ever tell you you could call it legal fees?

A. I have told you that's a very difficult question to say yes. In course of conversations it came up where I could call it legal fees, contributions, or what have you.

. . . .

THE WITNESS: Nobody ever programmed me to do that, but in the course of the conversation, it came up that it could be called a legal fee, it could be called contributions, but I wasn't going to call it a bribe.

. . . .

Q. Who told you that, sir?

A. I just told, you several people in the U.S. Attorney's Office.

Q. Tell me the name of the person who told you that?

A. It could have been anybody in the U.S. Attorney's Office, Bart Daniel, John Barton, Dale DuTremble.

Q. Who?

A. Maybe all of the above.

Q. Who?

A. I would leave it all of the above in the course of conversation.

[*Id.* at pp. 43–4, 46–7].

Contrary to the government's argument that "the defendants contend that Cobb had been given permission to call money he gave to Lindsay 'legal fees,'" [Gov.'s Post–Hearing Memo, 10/18/96, p. 25], it is Cobb who contends this in his sworn testimony. In his interview with the DOJ/OPR on September 8, 1994, USA Daniel responded to this allegation: "I don't know why Cobb would say it. It never ever happened." On May 26, 1994, AUSA Barton told the DOJ/OPR: "I recall nothing about someone coming up and saying to me Hey, Cobb asked if it was ok to call his payments to Lindsay a legal fee." And the notes of a telephone interview of AUSA DuTremble by the DOJ/OPR on November 10, 1994, show: "No recollection of Bart D. or any AUSA authorizing Cobb to call payments to JL 'legal fees' as recalled by Steve Smith—Surmises that Cobb may have interpreted USAO's position on the payments— 'You can call it anything you want to'—as auth to characterize it as a 'legal fee'."

Although there is no sworn testimony in evidence to refute Cobb's claim, this court is loath to give credence to Cobb's testimony over the statements of these prosecutors. Although it does not make a specific finding as to Cobb's truthfulness in this regard, the court has no reason to dispute Smith's testimony that Cobb did, in fact, make the statement.

**5.** *Drug Usage by Cobb.*

The defendants have argued extensively about Cobb's drug usage during the course of this entire matter. First of all, they complain of the withholding of evidence of his drug usage in possession of the government which was not furnished to them, thus hampering their efforts to impeach Cobb. Secondly, although they appear to argue that his drug usage may have affected his handling of the sting operation and his testimony, there is no real evidence that Cobb was, in fact, under the influence of drugs during these times. Thirdly, they utilize his repeated drug usage to bolster their argument that the government failed to control the actions

of a confidential informant in violation of FBI regulations; and, fourthly, they argue that the government's indictment of Cobb on two drug violations just prior to the Blanding/Gordon trial placed Cobb in a position to take the Fifth Amendment and further hamper their impeachment efforts.

Cobb was first approached by the FBI on April 28, 1989, and within a day or two became a paid confidential informant. A formal agreement was not entered into with the government until October 11, 1989.

On February 21, 1991, Cobb was indicted on two misdemeanor drug counts (21 U.S.C. 844(a)), for possession of cocaine on February 2, 1990, and January 11, 1991. He pled guilty to both counts on April 10, 1991.

Cobb's drug usage on the dates of October 13, October 18 and November 18, 1989, was disclosed at the trials. In addition, the indictment for possession of cocaine on February 2, 1990, and January 11, 1991, was returned a few days prior to the Blanding/Gordon trial, and Cobb was allowed to invoke his Fifth Amendment rights as to these two incidents during his testimony at that trial. Cobb pled guilty to these incidents prior to the Derrick and Long trials. SA Clemens testified that he admonished Cobb on the three occasions in late 1989 that his drug usage was not only illegal, but was in violation of his agreement with the government; however, the government did not charge him or discontinue his employment.

On July 17, 1990, Cobb testified before the Grand Jury that he had not used drugs since late 1989. Count One of the indictment to which he pled guilty would show his possession of cocaine in February of 1990;[35] therefore, this testimony, by Cobb's own admission, is false. In addition, Count Two of the indictment to which he pled guilty would show his possession of cocaine in January of 1991, which is within the time period between the Taylor trial and the Blanding/Gordon trial.

The full scope of Cobb's drug usage was often sought by the defendants in their quest for discovery materials which might impeach Cobb's testimony at defendants' trials. On November 29, 1993, the defendants received a minimum of six FBI documents which revealed that Cobb had been under investigation by the FBI for drug violations since early 1988 [Taylor's Supp.Memo, 2/10/94, Exh. 2], and that he had used cocaine on at least two other previously unknown occasions in May of 1989, after he went to work for the FBI [Id., Exh. 3]. Several of these documents indicate that Cobb was reputed to be a cocaine "trafficker" and implicated others, such as Greer and Kohn.

In contrast to representations by the government on the record in open court that they had given the defendants each and every tape they had [see Hearing Tr., 4/19/95, pp. 9–11], some 50 audiotapes and 118 FD–302s, which contain evidence bearing on Cobb's drug usage and trafficking, were received by defendants in February of 1995 [Taylor's Second Supp.Memo, 8/25/95, pp. 21–2].

It is now evident that Cobb had the reputation of a cocaine user and/or dealer and that this was known to the government prior to their employment of him in the sting. It is also evident that he purchased and/or used cocaine at least periodically during the time he was employed in the sting through the times he testified at the Taylor trial and at the Blanding/Gordon trial.

In his testimony regarding his drug usage, Cobb gave as reasons for the drug usage on which he was questioned as the need to protect his cover and, for one occasion, the emotional effect of the death of Lindsay. Cobb also claimed that the drug deal for which he was initially approached was done solely for the purpose of getting funds to pay his wife's medical bills. Just prior to his trial, Taylor offered to the court an affidavit by Cobb's wife, which was placed under seal, where she affirmatively stated that Cobb did not, in fact, contribute to the payment of her medical bills.

---

**35.** This incident took place only three (3) days prior to his meeting with defendant Taylor regarding Taylor's support of the parimutuel bill.

All of the defendants, possibly more so Taylor, Blanding and Gordon, were unable to impeach Cobb's testimony and confront him with the fact that he had been involved in drugs on more occasions and over a longer period of time than disclosed, and that his involvement in drugs was so deep that he had earned the reputation of a "trafficker." This information was, of course, known to the government since at least February of 1988.

### 6. *Evidence re Kohn.*

Kohn's involvement in the extensive use of cocaine and alcohol was admitted by him during the trials. On December 6, 1989, Cobb, as a government informant, participated in the videotaping of an occasion on which he purchased $500–worth of cocaine from Kohn. Kohn is then shown on the tape using cocaine. This tape (# 7) was not turned over to the defendants until sometime around the Derrick trial; however, Taylor concedes that he received a letter from the government very shortly before trial telling him that the government had evidence of Kohn giving cocaine to Cobb. He argues that he was deeply involved in preparing for trial; and, that since this is all that he was told, he did not take the time to pursue it. He indicates that had the government disclosed to him that a sale was recorded on video tape, and had he been told of the large amount of the purchase or that the tape showed the actual use of the cocaine by Kohn, he would have recognized its significance. Taylor contends that the jury's assessment of Kohn's credibility could well have been impacted by actually viewing Kohn "snorting" cocaine.

Although it is the government's responsibility to disclose evidence to the defendants in a timely and honest manner, it is also the responsibility of the defense to review that evidence when it is disclosed. The reference by the court to this particular issue, therefore, is not to excuse Taylor's failure to review the tape, but simply to show the cumulative effect on the defense of potentially impeachable material not being fully or timely disclosed.

The defendants argue that during the Taylor trial, in response to Taylor's effort to impeach Kohn, the government misled the court as to the relevancy of the issue of a personal insurance settlement by Kohn following Hurricane Hugo. The government objected on relevancy grounds when the defense attempted to cross-examine Kohn as follows:

Q. Did you have an insurance claim personally?

A. Yes, ma'am, I did.

Q. Was it on your house?

A. Yes, ma'am, my home.

Q. How much did you receive for that? Was it $100,000?

A. No it was not.

Mr. Daniel: Your Honor, I object as to the relevance.

The Court: It doesn't sound too relevant, Mrs. Courie.[36]

[Taylor Trial Tr., Vol. IV, p. 141]. What the government knew, but was unknown to the defendant Taylor and the subsequent trial defendants, was that there existed a tape (Tape # 98), made on April 26, 1990, of a discussion between Cobb and Kohn which would have gone directly to Kohn's credibility. Cobb inquires about Kohn's weekend plans and the conversation continues:

Kohn: Ah, I'm not sure. I got a—It ain't nothing exciting, just try to get caught up on a couple (unintelligible) in Charleston and get all my stuff together for my financial insurance settlement.

Cobb: Mm, hmm.

Kohn: Now that was the greatest scam I've ever pulled off. Turned a $500 claim into a $100,000 settlement.

Cobb: Wow. That would be your hit for the year.

Kohn: Mm, hmm.

Cobb: A nice one.

Kohn: Insurance is (unintelligible) I, set this company up. I mean I set the insurance company so there is nothing they can do on it.

Cobb: Huh?

Kohn: Set them up the whole way through and, uh, said well I need to bring my dad

---

**36.** Yolanda C. Courie, co-counsel for defendant Taylor.

into contract.' He says you don't need to bring anything. See I don't understand the instructions. I don't understand. He said all we're gonna talk about is how much money they're gonna give you. You see, the, the high, the lowest figure they're talking about borders in my range. (Unintelligible). I think I got them on unfair claims. (Unintelligible).

[Audiotape # 98, 4/26/90].

The defendants refer to this tape as "devastating" evidence, which was not furnished to them until after this court's order of November 9, 1994. As well as being evidence material to the impeachment of Kohn, the first part of this same tape records a meeting concerning the pari-mutuel bill. The tape is unintelligible for the most part in this regard; however, it is significant that the cover sheet (FD–302) specifically lists Taylor as one of the speakers. It is impossible, therefore, for the court to understand how the government could consider this particular tape "irrelevant."

It is well established that the government must often take its witnesses as it finds them. Yet in this case, Kohn was not only employed by the government as a confidential informant after he was approached by the FBI in May of 1990, but he was used to assist Cobb in actively soliciting fellow legislators and became a significant player in the sting operation.

### 7. Control of "Sting" Operation by Cobb.

Another of the defendants' allegations is that the government lost control over Cobb, its primary undercover informant. The Fourth Circuit Court of Appeals has referred to Cobb as the "cornerstone" of the government's case. The defendants allege that under the regulations governing this sting,

Cobb was forbidden to go out looking for people to bribe—this was to be strictly an "open door" operation. Yet we see that Cobb on occasion chose the legislators he wished to approach.[37] He was admonished that he could not use drugs during the course of the investigation, yet he repeatedly did so. It was Cobb who arranged the meetings with the defendants and notified the FBI when to turn on the video cameras. Cobb also convinced SA Clemens to participate with him in the very questionable 2:00 a.m. visit to Steve Smith's house and the telephone call to Lindsay.

The government originally paid Cobb $2,000 per month and later raised the amount to $4,000 per month. It is part of the record that these payments continued through the original trials, but it is unknown to the court whether these monthly payments are still being made. In addition, the government returned to him the $20,000 cash payment Cobb had made to an undercover agent in the cocaine investment deal that precipitated his involvement in Lost Trust. A $150,000 bonus for Cobb has been approved by the government; however, the last mention of this that the court can find in the record is that the payment was put on hold, and whether this bonus has ever been paid to Cobb is unknown to the court. If not, this bonus takes on some significance should he be required to testify in any retrials.

The court is of the opinion that Cobb maneuvered himself into the "driver's seat" position, and the government was a hostage to him. It is apparent that the government knew it had to "court" Cobb in order for him to work with them effectively. At times, he literally took over the investigation and directed its course. From its actions, it would

---

**37.** In his motion to dismiss on the grounds of entrapment, defendant Derrick claims that Cobb added Derrick to his target list in revenge for Cobb's loss of a client when Derrick would not support legislation known as the "Tent Sales" bill. In post-remand discovery furnished to defendants there was found a government file dated April 30, 1991, which contained what appears to be a manuscript of a proposed book by Cobb entitled *The Second Burning of Columbia*. The manuscript is in the form of an interview of Cobb ("R") and his then-girlfriend, Shelly Adams

("S"), by "D", later identified by the government as Doug Williams. A portion of that manuscript reads as follows:

 D You knew who they [the government] had files on going in? So there really was, there was a definite universe of people that you were charged with going after?

 R Yeah.

 D Did you add to that universe at all for the hell of it?

 R Yeah. Paul Derrick big time.

[Hearing, 4/19/95, Taylor Exh. 7, p. 27].

appear the government was afraid Cobb would pull out of the investigation and ruin their cases. According to a statement SA Clemens made to the OPR, Cobb flatly told the government from the very beginning that he would not testify against Lindsay and they could just take him to jail. Thus, Cobb forced the government on several important occasions into conduct not acceptable to the court.

### 8. Government "Targets" in Violation of "Sting" Guidelines.

The portion of Cobb's manuscript cited above to show the control Cobb had over the investigation has also been cited by the defendants to show that Cobb was encouraged to use the sting operation to pursue individuals already targeted by the FBI in violation of FBI regulations and that selective prosecution was also an issue.

In a teletype from the Director of the FBI to FBI–Columbia, receive-stamped " '89 NOV–1" [Taylor's Third Supp.Memo, 3/28/96, Exh. 4], in which the Columbia office is notified that the use of the pari-mutuel bill in this investigation is approved, the Columbia office is cautioned: "Columbia should ensure that this scenario is executed pursuant to investigative plan outlined in UCO Proposal, i.e., a passive approach through contacts with predicated lobbyists." The defendants contend that this investigation was anything but passive.

At a hearing on April 19, 1995, Gordon published several pages from the Cobb manuscript, *The Second Burning of Columbia.*[38]

COBB: B.J. Gordon, they had files on him; they had wanted him so f'n bad, they couldn't get him.

D: Because they just didn't have the evidence?

COBB: He had been to court two or three times. They had charged him two or three times. But he could always beat them. But he didn't outrun this boy.

D: And yet the FBI was okay with that? I mean the FBI—

COBB: They wanted him bad, bad.

[Hearing Tr., 4/19/95, p. 24].

He then continues to publish:

D: Did you, the pari-mutuel, put on the table as the idea? My experience in Alabama is that pari-mutuel betting is a black issue. And you had to know when you put pari-mutuel betting on the table that you're going to have a skewed number of blacks. Did you know that? Did the FBI know that?

COBB: Sure they knew it. I knew it. Hell, if I knew it I know they did. But we didn't discuss about the numbers. I'd talk a lot of times, I would make the comment a lot of times that I could have the whole black caucus. There would be no more damn niggers. It was kind of funny to them for a while until we got half of them and they said, pull in the reins, but believe me, we could have had most of them. Because you throw out some dollars and the mother f's first are going to be knocking the doors down. They were easy. Even B.J. as much trouble as they had with him. Shit I got him. The way I got him, f, you don't get away from it.

[*Id.* at pp. 24–5].

The above statements by Cobb would certainly indicate that the investigation went far outside the guidelines set forth for this sting.

### 9. The Report by the OPR

As hereinbefore mentioned, following the filing of the Taylor and Gordon motions to dismiss, USA J. Preston Strom, in February 1994, requested the Office of Professional Responsibility of the Department of Justice (DOJ/OPR) to investigate the allegations of prosecutorial misconduct raised by the defendants' motions. This procedure was unusual in that such investigations generally are not conducted by the OPR until after a judicial finding of misconduct.

The OPR "bifurcated" the investigation, requesting the FBI/OPR to investigate the

---

**38.** The government did not oppose the publication of this selected portion of the manuscript. It did oppose full publication on the basis of protection of any copyright privilege Cobb might assert.

allegations against SA Clemens. The DOJ/OPR then proceeded to address "only the USAO's failure to provide the two 302s complained of in both motions, those appearing to be the documents which raise the most serious misconduct issues." [Hearing, 4/19/95, Defs. Exh. 30, p. 10, ftn. 15]. These are the 302s dated June 22, 1989 and September 25, 1989 (the "secret" 302), which were not received by the defendants until November 1993. Both of these 302s dealt with Cobb's characterization of the cash payments he made to the defendants. Taylor's motion also included arguments of intentional wrongdoing in the government's failure to produce numerous additional documents, but the investigation did not address these. On December 6, 1994, the FBI/OPR reported its findings to the DOJ/OPR [Id., Exh. 45], and the DOJ/OPR amended its report to include these findings on February 16, 1995 [Id., Exh. 44]. The October 18th report concludes that, although

> "incremental mistakes and misjudgments were made by the FBI and prosecutors alike . . ., in our view, it is more plausible that these incremental failings rather than any intentional and wrongful decision to conceal led to the failure in the first two Lost Trust cases to provide the defense with the 302s dated June 22 and September 25, 1989."

[Id., Exh. 30, p. 22].

The amended report of February 16, 1994, made a finding that sanctions against SA Clemens were warranted as a result of the following infractions:

> . . . failure to effectively discharge his duties as case agent in connection with the management of discovery documents transmitted to the USAO; his failure to properly review all of his interview reports to properly prepare for testimony; unintentional misrepresentation in trial testimony; failure to properly maintain investigative notes in accordance with Bureau rules and regulations; failure to inform either the USAO or the Bureau upon discovery of the interview notes and his subsequent neglect of duty to report such an action as required in light of the controver-

sy surrounding his testimony; and failure to advise OPR of the interview notes. [Id., Exh. 44, p. 13]. The sanctions imposed have been previously cited in this order.

During its investigation, the OPR conducted numerous interviews, the notes of which, by order of the court, were furnished to the court and the defendants. The defendants have vigorously contested the limited scope of the investigation and the report. They question the decision to focus on only two 302s in light of their numerous allegations; they contend that numerous interviews were not incorporated into the report, and that the report does not accurately reflect the results of the interviews conducted. The court must agree in that there is an obvious omission of any consideration of the statement given to the OPR by SA Dick that it was clear to him that the monies Cobb paid to Lindsay were in violation of the Hobbs Act even though Cobb would never allow these transactions to be characterized as bribes—and that this was discussed many times among SA Clemens, the USAO and himself. SA Dick, as the supervisor of the White Collar Crime section of the Criminal Division, was thus the supervisor of the Lost Trust investigation. His statement that these discussions frequently occurred do not appear to be taken into consideration by the FBI/OPR in its determination as to Clemens alleged perjury on February 28, 1991.

At the time the DOJ/OPR and FBI/OPR investigations took place, only the motions of defendants Taylor and Gordon were under consideration; joinder by defendants Blanding, Derrick and Long in these motions and the filing of Derrick's dismissal motion came later. Further, the motions of Taylor and Gordon address issues based on additional discovery received in November of 1993. Subsequently, the government was ordered by several court orders to furnish other materials, which have led to additional allegations of misconduct not addressed by the OPR.

The court has carefully reviewed all of the interview notes. Although it will not make a definitive finding of misconduct by the OPR, it does appear that many questions were left either uninvestigated and/or unanswered.

Some of the pending allegations arose from additional discovery now in the hands of the defendants that was not before the OPR. The government continues to rely heavily on the findings of the OPR; this court does not share in that view. Therefore, it is only in a limited context that the court has considered the OPR's conclusions.

The OPR report did reveal that the government rushed into the Taylor trial before it was prepared to go to court. AUSA Du-Tremble has cited "pressure by the Governor" [Hearing, 10/18–20/95, Gordon Exh. P] as a reason for the government's haste. Other prosecutors indicated that it was important to the government to convict Taylor early on in the hope that other defendants would plead guilty as a result. It is also reflected in the report that during the investigation and preparation for trial there was utter confusion as to discovery and some dissention in the ranks both at the FBI and the AUSO, and that no real guidance was provided by the FBI to SA Clemens, a first-office agent.

In addition, in light of the pending trial status of these defendants, they object on the grounds of prejudicial pretrial publicity to a press conference held by FBI Director Louis Freeh on a visit to Columbia, South Carolina, following the issuance of the OPR report, in which he announced that the government had been cleared of all misconduct allegations. This press conference by Director Freeh presents a serious problem for the court. The lofty respect inherent in his position in the minds of the public is probably unparalleled. The legal position of these defendants at this time is that they are under indictment pending trial. Although some of the evidence before this court in its consideration of the motions to dismiss for prosecutorial misconduct may not be admissible at trial under the Federal Rules of Evidence, certainly much of it would be. A pretrial public statement by the FBI Director that this evidence has already been found to be without merit is appalling to this court.

### 10. *Continuing Discovery Problems.*

This court has found that the government continued to incrementally provide evidence relative to these motions even after recusal of the USAO for South Carolina and the appointment of attorneys from the Public Integrity Section of the DOJ in Washington. A review of the record will show that, following a status conference on October 20, 1994, the court in a written order filed November 9, 1994,

> ORDERED, that the United States make available to the within-named defendants, their attorneys and agents, no later than December 1, 1994, all audiotapes and videotapes and all reports of interviews (FBI FD–302s) and agents' rough notes pertinent thereto resulting from the "Operation Lost Trust" investigation.

[Order, 11/9/94, p. 2].

Some ten protective orders and orders ruling on requested *in camera* review were then filed by the court. On March 15 and 17, 1995, defendants Taylor and Gordon filed discovery motions relative to the motions to dismiss, which were heard on April 19, 1995. On April 20, 1995, the court

> ORDERED, that all documents and/or materials in possession of the government dealing with these cases and not presently available to the defendants in the "evidence room" be produced by the government direct to the court at Charleston, South Carolina, not later than Monday, May 8, 1995, for *in camera* inspection by the court. .... All internal administrative documents alleged by the government to be privileged are to be designated as such upon submission.

[Order, 4/19/95, p. 3].

Twelve boxes of documents were submitted by the government to the court for *in camera* review, and a detailed 21–page discovery order was filed as to the disposition of the materials therein on July 25, 1995. In this order the court notes:

> Defendants argue that the pattern and practice of behavior by the government has instilled in them a deep sense of mistrust and that a full *in camera* inspection of all materials in possession of the government was warranted. The government, although acknowledging the existence of an "open file" policy, has continued to ar-

gue as to what is and is not discoverable pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 [10 L.Ed.2d 215] (1963). In response to defendants' argument that the 65 audio tapes furnished in March 1995 should have been furnished with discovery materials for the original trials, the government claims that they dealt exclusively with drugs; that they were not turned over because they had not been and would not be used at trial, and, therefore, they were not relevant and not discoverable under *Brady.* The court finds the government's argument in this regard ludicrous. The record in these cases is clear that the drug investigation was hand-in-glove with the corruption investigation known as Lost Trust. Ten of the twenty-eight defendants pled to drug charges. Although the purpose of this order is not to address the motions to dismiss, government arguments such as this cause the court to look very closely at what was withheld by the government that may have jeopardized the rights of these defendants.

There also has been much discussion throughout these cases of the impact of an investigation by the government into federal violations in the handling of legislation known as the capital gains tax bill that had come before the South Carolina Legislature. The defendants claim there was a cover-up by the government and that they were not furnished the discovery needed to pursue the calling and/or impeachment of witnesses. The government acknowledges the investigation but states emphatically that it found this to be a non-issue and not relevant to the trials of these defendants. Again, the court does not wish at this time to make a finding on the merits of either argument; however, inasmuch as one of the key figures in the Lost Trust investigation pled to a RICO violation, one of the predicate offenses of which was the taking of a bribe from the government's cooperating subject and key Lost Trust witness, Ron Cobb, in relation to the capital gains tax bill, the government cannot now claim that its investigation into improprieties relevant to the capital gains tax legislation was irrelevant to these cases. The court,

therefore, can understand the defendants' arguments of mistrust.

[Order, 7/25/95, pp. 6–8].

This order also set forth a schedule for the filing of additional memorandums and set an evidentiary hearing on the subject motions for October 18, 1995. In the interim, the government furnished additional materials for *in camera* inspection on two separate occasions, and the court issued its rulings with regard to these materials on September 7 and October 6, 1995.

The October 6th order addresses a file received by the court which included "copies of the materials [obviously discoverable FD–302s and agents' rough notes]," and further states in pertinent part:

> It is unnecessary for the court to reiterate here the lengthy history of discovery problems in these cases. Suffice it to say that the materials furnished to the defendants and to the court on October 4, 1995, should have been furnished long ago.

[Order, 10/6/95, p. 2].

The first hearing on the motions to dismiss had been set for October 18, 1995, since the previous July. Yet here, just short of a year after the court's order establishing the evidence room and just two weeks prior to a hearing of the motions, the government was still turning over relevant evidence to these defendants. In addition, during the October 1995 hearing the existence of several FBI "CW" (Cooperating Witness) files came to light. One of the files contained an FD–302 not previously furnished to defendants. Defendants also moved for this court to reconsider portions of its July 25, 1995 order, and the court agreed to an *in camera* inspection of the CW files and several of the boxes of materials denied to defendants on July 25th. At the October hearing, the defendants also requested and received from the FBI computer-generated printouts of the inventories of the FBI's entire "Lost Trust" and "Capital Gains" files. On January 19, 1996, defendant Taylor moved the court to direct the government to provide access to all of the documents identified thereon. The court's order of February 6, 1996, as amended February 23, 1996, resulted.

The court's frustration at this point is evident in its February 6th order, which states in part:

> It is well past time for discovery to be completed. Although the court in no way wishes to jeopardize the investigative methods of the federal government, it is clear from a review of the records now before it that little, if anything, contained therein can still be classified as "sensitive." Additionally, all of the materials furnished are subject to protective orders restricting the use and dissemination of these materials. The court has previously opined that a wider latitude must be given with regard to materials to be furnished for the purposes of the defendants' pursuit of their motions to dismiss for prosecutorial misconduct than might be given for trial preparation. The alleged misconduct of government attorneys and agents during the preparation and trials of these cases is the basis for the defendants' motions, and defendants' argument that they are entitled to a thorough review of the government's records is not without merit, particularly in light of the discovery history in these matters. ·

· · · ·.

> ... although there may be some justification for the delay in furnishing some materials to the defendants as ordered by the court, the volume of the materials which have surfaced just over the past few months and their possible significance to the defendants is of concern to the court.

[Order, 2/6/96, pp. 7–8].

In its Post–Hearing Memorandum, the government attempts to explain why certain files were not submitted to the court as and when ordered. As shown above, the court ordered the government to make available to the defendants all documents known by the government to be of a nature to be used by defendants to impeach witnesses or support the defendants' theories of their defenses. These cases were and are being prosecuted by various government attorneys, and for various reasons they have withheld documents that would have been of assistance to the defendants in defending the charges

against them. The government now concedes that numerous mistakes were made in furnishing discovery and the DOJ/OPR in its report found that

> incremental mistakes and misjudgments were made by the FBI and prosecutors alike and, in our view, it is more plausible that these incremental failings rather than any intentional and wrongful decisions to conceal led to the failure in the first two Lost Trust cases to provide the defense with the 302s [required].

[Gov's Post–Hearing Memo, 10/18/96, p. 6]. The court cannot agree with this finding because the failings of the government to provide meaningful discovery were so numerous that it would be disingenuous to say that these mistakes were incremental failings rather than intentional or wrongful decisions. In fact, these failings, spanned over the time from the beginning of these cases until just several months ago, amount to a pattern of conduct.

In undisputed testimony on October 3, 1996 [Hearing Tr., 10/3/96, p. 182], the court was informed that prior to his trial Taylor received only 66 of the 550–plus–or–minus 302s and 26 of the 227–plus–or–minus tapes that are now in defendants' possession. The number of 302s and tapes received pretrial by the other defendants would vary only slightly.

## VI. THE COURT'S SUPERVISORY POWER

In the case of *United States v. Banks,* 383 F.Supp. 389 (D.S.D.1974), *appeal dismissed, United States v. Means,* 513 F.2d 1329 (8th Cir.1975), that court, in a Memorandum Decision treating defendants' motion for acquittal as a motion to dismiss for government misconduct, dismissed with prejudice the charges against the defendants by the use of its supervisory power. The *Banks* court, citing to *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), decided that the court's supervisory power can be utilized whenever the administration of justice is tainted, and, indeed, it is the court's duty to "[establish] and [maintain] civilized standards of procedure and evidence." [*Id.* at 340, 63 S.Ct. at 613]. Some of the circuits

have found that demonstrable prejudice must exist in order for the court to exercise its supervisory power; however, the court in *Banks* found that it need not address whether due process was offended when the facts showed such aggravated conduct as to warrant dismissal. In the Fourth Circuit case, *United States v. Omni Intern. Corp.,* 634 F.Supp. 1414 (D.Md.1986), Judge Black discusses the requirement of prejudice and concludes that "[a] common thread underlying many decisions is that the magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown." *Id.* at 1438. *See, e.g., United States v. Serubo,* 604 F.2d 807, 818 (3d Cir.1979) (prosecutorial conduct extreme); *United States v. Hogan,* 712 F.2d 757 (2d Cir.1983) (misconduct flagrant); *United States v. Fischbach & Moore, Inc.,* 576 F.Supp. 1384, 1396 (W.D.Pa.1983) (isolated incident of misconduct).

 This court has weighed the seriousness of the misconduct against the available remedies, and finds that, as in the *Banks* and *Omni* cases, the misconduct here is repetitious, flagrant and longstanding. *See Banks,* 383 F.Supp. at 392; *Omni,* 634 F.Supp. at 1438; *United States v. Hogan,* 712 F.2d at 761; *United States v. Lawson,* 502 F.Supp. 158, 172 (D.Md.1980). I also find that the government's misconduct "need not be so unfair or imprudent as to offend 'due process' before exercise of this [court's] supervisory power is appropriate." *McNabb,* 318 U.S. at 340, 63 S.Ct. at 613. Although this court is of the opinion that the sixth amendment right to a fair trial guaranteed to each of these defendants has been jeopardized because of the government's actions throughout these proceedings, the Constitutional issues raised by the instant motions need not be addressed.

The court is convinced that this investigation began in an appropriate fashion. It is, after all, the responsibility of the FBI and the USAO to pursue information with regard to illegal acts within their jurisdiction. It is the opinion of the court, however, that some of the investigators and lead prosecutors got lost on their way to the lofty goal of weeding out drugs and corruption from the South

Carolina State House. Overzealousness and political pressure upon those in positions of authority appear to be the detours that led the government to rush to trial, especially in the cases of Taylor, Blanding and Gordon; to withhold volumes of exculpatory evidence; to allow perjured testimony to stand uncorrected on more than one occasion; to allow its primary cooperating witness, Cobb, to take an unusual amount of control of the sting operation; to go outside of its own regulations to target certain legislators, and to mislead this court to such an extent as to perpetrate a fraud upon the court.

> While lawyers representing private parties may—indeed, must—do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules. [Citations omitted]. As Justice Douglas once warned, "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–49, 94 S.Ct. 1868, 1874, 40 L.Ed.2d 431 (1974) (Douglas, J., dissenting).

*U.S. v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir. 1993).

Almost without exception, the lead prosecutors in these cases had practiced before this court many times, and the "open file" policy of this district and this court had never before come into question. USA Daniel was an Assistant U.S. Attorney in Charleston for several years and prosecuted high-profile, multi-defendant cases before this court. The "open file" policy was never disputed during those trials, and Daniel was totally familiar with it. As the United States Attorney guiding the prosecution of the within cases, it was his responsibility to oversee the handling of discovery. The withholding of such a voluminous array of discovery which the government had to know was exculpatory and relevant to the defenses of these defendants is unprecedented before this court. The court

finds that these violations are too numerous and too specific to certain issues to be considered simply unintentional or the result of neglect. For example, it is unfathomable that the government could have possibly considered the drug investigation of Cobb prior to his employment as a confidential informant, or the investigation of Cobb, Lindsay and Greer in the capital gains tax investigation, as anything *but* relevant.

Even more offensive to the court are the continual misrepresentations made to the court that all discovery to which the defendants were entitled had been turned over to them. The government had to have been aware of so much information that incriminated public figures holding powerful positions, yet it did not submit to the court for review the discovery it claimed would jeopardize on-going investigations or that it claimed to be irrelevant. The constant assurances that "we have given them everything," the veracity of which the court had no reason at that time to question, rises to the level of outrageous conduct. It would be impossible to cite to each instance where this type of assurance was repeated.

It appears that in these cases, much of the government's misconduct actually stems from its failure to disclose evidence to the defendants. In the case of *United States v. De-Marco*, 407 F.Supp. 107 (C.D.Cal.1975), the withholding of exculpatory evidence alone was sufficient to grant a dismissal of the indictment, albeit without prejudice.

> "His [the prosecutor's] duty is to provide exculpatory evidence to the defense and then seek to rebut it before the trier of fact. It is not the prosecutor's function to structure a proceeding in such a way that exculpatory material is concealed from the defense, the court, and the jury."

*Id.* at 112.

In addition, the court finds that the government, during the period following remand of these cases and in connection with the instant motions, continued its course of action with regard to the disclosure of evidence, in violation of court orders. Its attitude concerning discovery continued well into 1996, even after the court admonished it that the determination of relevancy of the materials relating to the motions to dismiss was within the jurisdiction of the court and not the government.

The court is of the opinion that an investigation and subsequent prosecution of what might have started out with the altruistic motive of ridding the State Legislature of drugs and political corruption became a political bombshell that backfired. The entire Lost Trust matter was a political "coup" as well as a political "hot potato" for the United States Attorney's Office. USA Daniel called a press conference to announce the initial indictments. The defendants had claimed that this press conference constituted prejudicial pretrial publicity and they now question whether authority for it was even given USA Daniel, as required, by the Department of Justice. No substantial evidence one way or the other on the question of authority was ever offered, nor does the court find that the defendants have offered any additional testimony to meet the burden of proving that they were directly prejudiced by this press conference.[39]

This press conference did create, however, an atmosphere of public expectation from which the government could not retreat, even when the investigation led to roads it did not want to travel. When they chose Cobb as the focal point of the sting, they had to carry all the baggage he brought with him—his drug use, his refusal to involve Lindsay, his apparent inability to be totally truthful, and his unwillingness to follow instructions. The government lost control of its star witness, both during the sting operation and during his testimony at the trials. This allowed Cobb to choose the legislators he wished to

---

39. The court would take note, however, that it was inappropriate for the USAO to conduct that press conference from a courtroom in the United States Courthouse. The Department of Justice is an arm of the Executive Branch of the government of the United States. In this court's opinion, under the "separation of powers doctrine" of the United States Constitution, the use of a Federal courtroom by the Department of Justice to further its prosecutorial position blurs the distinction between the adversary nature of the prosecution and the "blind justice" nature of the courts, which operate under the Judicial Branch of the United States government.

solicit, specifically, Derrick, Gordon and members of the Black Caucus—for whatever his purposes—and to protect those he wished by characterizing—as he saw fit—the payments he made to them, even to the point of perjuring himself with regard to payoffs he made to Lindsay. Evidence of how Cobb often paid various legislators a few hundred dollars to "keep them friendly" and that it was no concern of his how the recipients handled the monies, was not furnished by the government so as to allow the defendants to attempt to impeach Cobb's testimony that the payments he made to these defendants (excluding Long) were known by him and by them to be bribes.

The court further finds that the government did, in fact, allow testimony from Cobb, Clemens and Greer that it knew to be untrue to stand uncorrected. This court shares the concern expressed by the court in *United States v. Wallach*, 935 F.2d 445, 457 (2d Cir.1991): "We fear that given the importance of [a witness's] testimony to the case, the prosecutors may have consciously avoided recognizing the obvious—[that he] was not telling the truth."

Once the government entered into the agreement with Cobb that he would never have to testify against Lindsay, it put itself in an untenable position. Its cases against these defendants rested in large measure on Cobb's testimony at trial. Sufficient evidence has now been disclosed to prove that Cobb did pay a bribe to Lindsay in connection with the capital gains tax bill and, further, that Cobb admitted as early as May 1, 1989, that he had paid Lindsay a bribe in connection with the oil jobbers bill. His sworn testimony that he never paid Lindsay a bribe was perjurious several times over. Unfortunately, SA Clemens had helped to dig the hole in which he found himself and,. apparently, felt he had to play out the scenario to the end.

When the government found itself in a position which forced it to investigate Greer, the situation became even more explosive. There is no way the court can ignore the inconsistencies in and omissions from the record in the matter of Greer and the capital gains tax bill. The government's actions as outlined in this order suggest a total avoidance of pursuing information that might have proved adverse to Greer. The record is replete with implications that Greer was heavily involved in the payoffs related to the capital gains tax bill, yet no FD–302s or agents' rough notes of any debriefings of Greer regarding capital gains and no indication the government ever sought to review his financial records can be found. Even the information advanced by the government at Greer's sentencing that would tend to be in Greer's favor is not substantiated by anything in the record. His testimony before the Grand Jury would have to be perjured if the arguments advanced by the government at Greer's sentencing hearing are true. Alternatively, if Greer told the truth to the Grand Jury, then the government has lied to the court. The government's failure to fully investigate Greer might be excused as falling within the province of the government's prosecutorial discretion if his alleged involvement was isolated. The fact that it surfaced in an investigation resulting in the convictions of these defendants and may have had an impact on the fairness of their trials puts the government's handling of Greer's involvement in an entirely different light.

Most offensive to the court, however, is that the government sat silent—when it knew that its silence would not only foil the efforts of the defendants to fully develop defenses to which they were entitled, but would misrepresent facts to both the Grand Jury and the trial jury, and mislead the court to such an extent as to effect its rulings at trial and in collateral proceedings. As reluctant as this court is to call it such—this silence in several instances constitutes subornation of perjury.

This court will not shrink from its share of responsibility and admits its total reliance on the government's representations, at least through the original trials. It did warn the government on numerous occasions that, if it was not being candid and forthright, the court would take the appropriate steps available to it. Without the defendants' unrelenting pursuit of their motions, however, much of what is now known may never have seen the light of day. The government attempts

to show its willingness to own up to any misconduct in a footnote to its final memorandum, stating that it was the expanded discovery voluntarily furnished by the government following remand that led to these motions and not the defendants' own investigative work or requests under the FOIA. [Gov's Post–Hearing Memo, 10/18/96, p. 29, ftn. 13]. Considering the on-going discovery problems in these cases, the court finds this absurd. Because the Fourth Circuit Court of Appeals was also unaware of the substantial amount and probative content of discovery materials withheld, had these cases not been remanded for retrial on entirely different grounds, the convictions of these defendants would stand. It was not until the first wave of discovery for retrials, which contained numerous previously withheld documents, was furnished in November of 1993 that the court had any reason to believe that some of its previous rulings were based on limited and/or erroneous information. Thereafter, for the purposes of the motions to dismiss, it allowed great latitude in the disclosure of discovery materials. Only then was the wide-ranging scope of the government's misconduct available to the defendants and apparent to the court. There is no way to avoid the conclusion that the various and repeated acts of the government were simply wrong; that the government acted in bad faith, and its misconduct is not only greatly offensive to this court, but has interfered with this court's duty to insure the proper administration of justice.

In summary, the court is of the opinion that the evidence of the government's misconduct from the time this investigation commenced until the present, in its totality, is sufficiently egregious to warrant dismissal of these indictments with prejudice under the doctrine of supervisory power. It is, therefore,

ORDERED, that the Superseding Indictment in Criminal Nos. 3:90–00339 and 3:90–00434 against defendants LUTHER LANGFORD TAYLOR, LARRY BLANDING and BENJAMIN J. GORDON, JR. be, and the same is hereby dismissed with prejudice. It is

ORDERED FURTHER, that the Indictment in Criminal No. 3:91–00091 against defendant PAUL WAYNE DERRICK be, and the same is hereby dismissed with prejudice. It is

ORDERED FURTHER, that the Indictment in Criminal No. 3:91–00384 against defendant JEFFERSON MARION LONG, JR. be, and the same is hereby, dismissed with prejudice.

AND IT IS SO ORDERED.